PREMIUM PRODUCTS SALES
CORP., Plaintiff,

v.

CHIPWICH, INC., et al., Defendants.

No. 82–1417(LBS).

United States District Court,
S. D. New York.

May 14, 1982.

**428**

Donovan Leisure Newton & Irvine, New York City, for plaintiff; Sanford M. Litvack, Doris Shaw and Kevin J. Walsh, of counsel.

Pavia & Harcourt, New York City, for defendants; David Botwinik, New York City, of counsel.

SAND, District Judge.

This is an action for the breach of a distributorship contract which concerned the marketing of certain ice cream sandwiches called "Chipwiches." The defendant, Chipwich, Inc. ("Chipwich") now moves to disqualify plaintiff's counsel, the firm of Donovan Leisure Newton & Irvine ("Dono-

van Leisure"). The essence of the argument that Donovan Leisure should be disqualified is that Donovan Leisure drafted certain contracts and letters on behalf of Chipwich. The plaintiff, Premium Products Sales Corporation ("Premium") contends that Donovan Leisure at all times acted as counsel solely to Premium. The motion for disqualification is denied for reasons set forth herein.

Several key factual questions necessitated an evidentiary hearing, which was held on May 6, 1982. The parties presented the evidence outlined below.

*Background*

The relationship among Chipwich, Premium, and Donovan Leisure can best be explained by first detailing the roles of James M. Stevens ("Stevens") and Samuel Metzger ("Metzger") and then describing Donovan Leisure's role in drafting several agreements and letters.

Stevens began his relationship with Donovan Leisure prior to the founding of either Chipwich or Premium. In 1977, Stevens was employed as senior vice-president in charge of sales for Great Waters of France ("Great Waters"), and in this capacity, he successfully marketed Perrier water in the United States. After a former business associate of his recommended Doris Shaw ("Shaw"), an associate with Donovan Leisure, Stevens began to refer Great Waters' legal matters to that firm. Between January 1977 and February 1981, Stevens worked closely with Shaw. In February 1981, Stevens left Great Waters to form his own marketing company, Premium. Stevens acquired a 50 percent stock interest in Premium and became its president. The other principal, Bruce Nevins, became chief executive officer. Stevens referred Premium legal matters to Donovan Leisure.

One of Premium's first clients, soon to become its major client, is Chipwich. In March 1981, Donovan Leisure drafted a contract between Premium and Chipwich. Under the terms of this contract, Premium, in exchange for 14 percent of the gross receipts from the sale of Chipwiches, would serve as Chipwich's exclusive agent for marketing and selling.

Chipwich was at this time a very young company. Its product was being made by hand in quantities too small to permit its entry into the conventional retail market. Chipwich's founders, Richard LaMotta (inventor of the chocolate chip cookie enclosed ice cream bar known as the Chipwich) and Metzger had thus planned a distribution system through the means of pushcart vendors. Premium, however, developed a plan for retail marketing which would require that Chipwich automate its production.

Because Stevens was thought to possess the expertise needed to set up the factory, he became the acting president and chief operating officer of Chipwich in May 1981. Stevens testified that he worked full time as Chipwich's president; his role with Premium demanding little work because of Chipwich's production problems which barred the implementation of Premium's retail marketing plan for that product. During the period when Stevens was president of both companies, a merger of Premium and Chipwich was planned; but in late November 1981, after Metzger had become very critical of Stevens handling of the manufacturing aspect of Chipwich, the merger plan was abandoned. In January 1982, Metzger replaced Stevens as Chipwich's president, and Jason Smith replaced him as chief operating officer.

It was during the period when Stevens served as president of both Chipwich and Premium that Donovan Leisure drafted three agreements and two letters which form the basis of the present disqualification controversy. Before describing these documents, Metzger's role should be clarified.

Metzger has served as Chipwich's chief executive officer since its founding in January 1981, and as stated above, he now serves as its president as well. Metzger is an attorney who has been a member of the bar since 1966. In his work on behalf of Chipwich, he considers himself to be acting in the role of a businessman. Metzger characterizes himself as a specialist in labor

law, and has performed legal work for Chipwich in that field. However, he has taken responsibility for the referral of all of Chipwich's other legal work to outside counsel. Pursuant to his referrals, Robert E. Porges has handled a private placement; Offner & Kuhn handled certain trademark litigation, and Paul, Weiss, Rifkind, Wharton & Garrison performed other legal work. I might say parenthetically that Metzger's plans to form a law firm with Porges and the extent to which these plans were carried out were the subject of much testimony at the hearing. Although the testimony was relevant to Metzger's credibility, it has little, if any, other relevance to the issues currently before the court. Metzger never referred a Chipwich legal matter to Donovan Leisure. Metzger instructed Stevens to refer all Chipwich legal matters to him. Metzger testified that Stevens never failed to follow those instructions.

The instant motion to disqualify cites a conflict of interest arising from Donovan Leisure's drafting of three letter agreements. Premium had negotiated with Haagen-Dazs, Inc. in an effort to secure a means of retail distribution for Chipwich. In November 1981, Stevens consulted with Shaw about the preparation of writings which would reflect the arrangement with Haagen-Dazs. Although Stevens testified that he had originally thought that Premium and Haagen-Dazs should be the parties to the agreement, Shaw, after consultation with other Donovan Leisure attorneys, advised him that Chipwich rather than Premium should sign the agreement. Donovan Leisure recommended this form because only Chipwich could guarantee the supply of the product and because Premium planned, in any event, to merge with Chipwich. Donovan Leisure then prepared two letter agreements between Chipwich and Haagen-Dazs: (1) an agreement appointing Haagen-Dazs as a distributor of Chipwiches; and (2) a consulting agreement under which Haagen-Dazs would receive 5.5 percent of Chipwich's gross receipts within the territory of Haagen-Dazs' distributorship. A third agreement modified the preexisting arrangement between Premium and Chipwich so as to eliminate a possible conflict between the Haagen-Dazs consulting agreement and Premium's exclusive agency agreement. Under the terms of the third agreement Premium would receive 14 percent of gross receipts obtained through Haagen-Dazs. One of the issues in the present case is whether Stevens in entering these agreements violated his fiduciary duties as an officer of Chipwich.

Chipwich asserts that Donovan Leisure entered into an attorney-client relationship with Chipwich when it drafted these agreements. It bases this assertion on the following evidence. Stevens was president and chief executive operating officer of Chipwich when he requested Donovan Leisure to draft the agreements. On December 23, 1981, Metzger met with Stevens in a Donovan Leisure conference room where he reviewed and signed the agreements. Metzger testified that no one had ever told him that Donovan Leisure was Premium's attorney and that he thought that Joel Siegal, an attorney who he asserts represented Stevens and Nevins with respect to the March 1981 contract, was Premium's attorney. Metzger spoke with Shaw briefly. (Shaw left Metzger and Stevens alone in the room for most of their meeting). Metzger knew that Donovan Leisure drafted the agreement to which Chipwich was a party, and he assumed that it did so on Chipwich's behalf. Metzger testified that he did not know why Chipwich rather than Premium was made a party to the Haagen-Dazs agreement. He testified that his signing on behalf of Chipwich instead of Stevens' signing did not lead him to think that Stevens acted solely on behalf of Premium because he knew Stevens would have to sign one of the agreements on behalf of Premium.

Metzger testified, as I've indicated, that no one ever told him that Donovan Leisure did not represent Chipwich and that no one ever asked him whether he was serving as Chipwich's counsel. He testified that he believed Stevens had hired the firm, that Stevens knew Metzger did not act as counsel to Chipwich unless the matter involved labor law, and that Metzger assumed Ste-

vens as president of Chipwich would do what was best for Chipwich. Metzger, when asked whether he served as Chipwich's counsel in reviewing the three agreements, stated:

"Well, I didn't hire a specific attorney for it. If my implication is I am an attorney—I was conducting myself as a businessman. If it is interpreted, because of my degree, that I was acting as an attorney—but I was a businessman reviewing the agreement and doing what I thought best for the company."

Transcript of April 28, 1981 hearing, at pages 23–24.

Chipwich notes that it agreed to pay Donovan Leisure's bill for the drafting of the three agreements. (In fact, Chipwich has never paid this bill, both because of this dispute and because of its lack of funds.)

Chipwich also argues that Donovan Leisure entered into an attorney-client relationship with Chipwich when it responded to a letter sent by Steven H. Thal, Esq., on behalf of Martin Ice Cream Company, Inc. The letter, which charged Chipwich with antitrust violations in the distribution of its ice cream sandwiches, was addressed to "Mr. James S. Stevens, president/Chipwich Incorporated." Stevens had received the letter prior to the December 23, 1981 meeting. At the meeting Stevens and Metzger discussed the letter. According to Metzger, Stevens reassured him that Donovan Leisure was experienced in the antitrust field and that no antitrust violation had occurred, Stevens asked Metzger if he wanted Shaw to respond to the Thal letter, and Metzger said "Yes." Metzger testified that he did not remember whether Shaw was present when Stevens reassured him about the Martin Ice Cream problem, but he did recall that Shaw was present when he agreed that she should respond to the Thal letter. Thal also sent a second letter which drew a short response from Shaw. Again, Metzger testified, he assumed the firm would act on Chipwich's behalf, and, again, no one told him that the firm did not represent Chipwich.

In addition, the billing for the work on the Thal letter appeared in the bill for the drafting of the letters of agreement with Haagen-Dazs which Chipwich had agreed to pay.

Premium, in support of its view that no representation occurred, presented the following evidence: Stevens testified that, following Metzger's instructions, he referred all legal matters to Metzger and was not authorized to hire a law firm for Chipwich. Moreover, Metzger's strong criticism of Stevens' performance as president renders it even more unlikely that Metzger would have silently accepted Stevens' hiring of a law firm for Chipwich. Metzger is an attorney of 16 years experience, and Metzger received the proposed agreements for review in advance of the meeting. (Metzger testified that he did not remember whether he had seen the drafts before the meeting, but the documentary evidence shows that Metzger was copied on a covering letter of November 13, 1981, which included an attached copy of the draft.) Metzger failed to refer these documents to any outside counsel, so one might infer, according to Stevens, that he chose to undertake legal representation of Chipwich in this matter. Such a deviation from his usual practice of handling only labor matters could be explained by Metzger's haste to complete the Haagen-Dazs deal because of the favorable effect it would have on Chipwich's imminent private placement. In addition, Stevens took issue with Metzger's contention that he only handled labor-related legal matters. Stevens testified that Metzger had negotiated a lease and drafted a contract between Chipwich and a company that was to supply Chipwich with cookies. Stevens also stated that when he first met Metzger, Metzger told him that he was experienced in securities law as well as labor law.

With respect to Chipwich's contention that its payment of legal fees demonstrates an attorney-client relationship, Stevens testified that Donovan Leisure had already billed Premium for part of its services in connection with this matter, that all bills named Premium and not Chipwich as the

client, and that Chipwich merely agreed to assume Premium's debt because it knew of Premium's cash flow problem. Metzger, in agreeing to pay the firm's bill, according to both Stevens and Shaw, commented on how low the fees seemed in relation to those of Chipwich's own outside counsel and joked about switching firms.

In response to Chipwich's contention that no one ever informed Metzger that Donovan Leisure did not represent Chipwich, Stevens and Shaw noted that Metzger never inquired whether Donovan Leisure represented Chipwich, he never confided with anyone at Donovan Leisure, and he never made any attempt himself to hire the firm or to assure himself that Chipwich was represented. Stevens testified that he specifically told Metzger at the time of the March 1981 contract between Premium and Chipwich that Donovan Leisure was Chipwich's attorney. (Metzger testified that he had no memory of such a conversation).

Stevens and Shaw's testimony tended to discount the importance of the fact that the December 23, 1981 meeting took place at Donovan Leisure's offices. Stevens testified that he needed to meet with Shaw that day because the final copies of the draft were being typed at the firm, and thus he arranged his meeting with Metzger to take place in a conference room there with Shaw's permission. Although Metzger had testified that the meeting had been scheduled several weeks in advance, Stevens testified that the meeting was to have taken place at Metzger's office; and it was only after Donovan Leisure encountered delays in processing the documents in the traditional pre-Christmas confusion, that Stevens requested that Metzger join him at the firm simply as a matter of convenience. Again, Stevens noted that Metzger had emphasized the importance of speed in finishing these documents. Both Shaw and Stevens testified that Shaw's role was chiefly that of a conduit between the two men and the typing pool. Shaw testified that she did not review the documents with Metzger or offer him any legal advice. Shaw also stated that when Stevens explained certain changes he had made in the agreements,

Metzger appeared to understand well and that Metzger suggested that the parties initial every page.

Shaw testified that she never considered Chipwich to be the firm's client. She noted that the firm follows a somewhat complex regular procedure when it accepts a new client and that no such procedure was followed with respect to Chipwich. Moreover, the firm's involvement in the preparation of the agreements was limited to drafting. Stevens alone negotiated the arrangements with Haagen-Dazs; Donovan Leisure had no direct contact with Haagen-Dazs.

Both Shaw and Stevens testified that Metzger never spoke with Shaw about the Thal letter. Stevens denied that he told Metzger that he would ask Shaw to respond to the letter on behalf of Chipwich, and Shaw testified that no such request was made. Moreover, Stevens showed Metzger a copy of Shaw's response to Thal which expressly stated, "I am writing on behalf of our client, Premium Products Sales Corp." Affidavit of Samuel Metzger, Exhibit G. Shaw testified that she never offered any advice on the question whether Chipwich needed to respond to the Thal letter.

Finally, Shaw testified that Donovan Leisure included the billing for this work in the bill for the drafting of the three letters of agreement that Chipwich had agreed to pay, simply because it was such a small percentage of the total amount due that the firm did not bother to segregate that item.

*Discussion*

The trial court may disqualify counsel when it is "necessary to preserve the integrity of the adversary process" in the action currently before it. *Board of Education of New York City v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979). But the Court must exercise this power with restraint because of its impact on the client who would be forced to seek new counsel. *Id.*

Chipwich asserts that Donovan Leisure is disqualified as Premium's counsel in this action under Canons 4, 5 and 9 of the Code of Professional Responsibility, and because Doris Shaw, one of the associates of Dono-

van Leisure, may be a necessary fact witness.

■ As to Canon 4, disqualification may arise out of the attorney's duty to preserve the secrets and confidences of his client. In order to avoid the problem of forcing the former client to reveal confidences and secrets in the process of attempting to show disqualification, courts require only a showing that the former attorney has undertaken to represent a party adverse to his former client in a matter substantially related to one in which he represented the former client. *NCK Organization, Ltd. v. Bregman*, 542 F.2d 128, 132 (2d Cir., 1976) (*citing* T. C. Theater v. Warner Brothers *Pictures*, 113 F.Supp. 265, 268–269 (S.D. N.Y. 1953)).

■ The duty to preserve confidences and secrets only attaches when an attorney-client relationship exists, and thus our threshold inquiry must be whether Donovan Leisure ever became Chipwich's counsel. In this regard, it is important to take into account not only whether the parties made a formal arrangement but also whether the would-be client reasonably believed that he approached the attorney with a "manifest intent to seek legal advice" and whether the attorney actually performed professional services in his capacity as a legal advisor. Developments in the Law—Conflicts of Interest in the Legal Profession, 94 Harvard Law Review, 1244, 1321–23 (1981).

■ Taking these factors into consideration from the perspective of Metzger as well as Stevens, the Court finds that Donovan Leisure and Chipwich did not enter into an attorney-client relationship. Stevens did not seek Donovan Leisure's legal advice on behalf of Chipwich. He merely continued to refer Premium's legal matters to the firm he had used since 1977. That some of this work involved agreements to which Chipwich became a party cannot automatically make Donovan Leisure Chipwich's attorney.

Chipwich argues that because Stevens was its president when he sought legal services in a Chipwich matter, he sought them on behalf of Chipwich. But the evidence clearly refutes such an inference. It was Premium's business to arrange the distribution of Chipwiches. So when Stevens referred these agreements, he could well have intended them to be handled as only Premium's concerns. The importance of his Chipwich presidency is considerably diminished by the fact that he had assumed this position only for the limited purpose of procuring increased production. Metzger explicitly instructed Stevens to refer all Chipwich legal matters to Metzger. Thus, according to the testimony of both Stevens and Metzger, Stevens could not reasonably have seen himself as empowered to hire a law firm for Chipwich. It is therefore more reasonable to infer that Stevens acted solely for Premium when he approached Donovan Leisure in these matters. Moreover, when Stevens conveyed the draft agreements to Metzger for his approval, he was referring Chipwich legal matters to Metzger in accordance with Metzger's instructions. We, therefore, cannot find that Stevens exceeded his power and authority and sought legal advice for Chipwich without Metzger's prior approval.

The heart of Chipwich's argument that Donovan Leisure represented Chipwich centers on the understanding and expectations of Metzger. We do not find that Metzger himself sought, obtained or relied upon legal advice from Donovan Leisure. None of Metzger's contacts with Shaw manifested an intent to seek legal advice, nor did she or the firm ever give him advice or perform any legal services at his behest. Metzger's agreement that Chipwich would pay the firm's bill, which would not in itself generate an attorney-client relationship, appears to have been a convenient business arrangement undertaken because of Premium's lack of funds.

■ We turn then to the significance of Metzger's subjective understanding as manifested by the objective circumstances. Both sides claim that the lack of any discussion of whether Donovan Leisure represented Chipwich supports their view. Premium argues that no one ever said there

was representation, and Chipwich counters that no one ever said there was not. The real meaning of the silence lies in the analysis of what the alleged client could reasonably have believed. We find the evidence shows that Metzger could not reasonably have thought that Donovan Leisure became Chipwich's attorney. Metzger knew Stevens's primary concern was Premium and that his role as Chipwich president was a temporary accommodation. Metzger should have known that when Stevens' arranged Chipwich's marketing and distribution, he did so as an employee of Premium pursuant to the March 1981 contract. He knew that Stevens had no authority to hire a law firm for Chipwich. He testified that Stevens faithfully referred all Chipwich legal matters to him for further referral. He knew at the time of the December 23, 1981 meeting that Stevens was on his way out as president, and he personally had been critical of Stevens. Thus, he should have considered it unlikely that Stevens had varied from his practice of referring all Chipwich legal matters to Metzger.

It appears that Stevens provided Metzger with copies of these contracts in advance of the meeting. Metzger's choice not to involve Chipwich's usual outside counsel appears to have been a conscious choice. Metzger wanted to speed the contracts along. The legal terms of these documents were well within his grasp as an attorney, despite his labor law specialization. He reviewed the amendments to the drafts on December 23, and he appeared to understand them, and he even suggested the added legal formality of initialing every page. I might note that Chipwich's present quarrel with these agreements centers principally upon the allocation of gross profits to various parties rather than any subtle technicality that Metzger might claim to have been not sufficiently sophisticated to have understood and appreciated.

Other evidence supports the view that Metzger was not lulled into thinking Chipwich was represented by Donovan Leisure.

There was evidence that Stevens had told Metzger in March 1981 that Donovan Lei-

sure was Premium's law firm. The Court finds, the December 23 meeting took place at Donovan Leisure simply as a matter of convenience. It was basically a meeting between Metzger and Stevens and not a consultation with Shaw. It may be that Metzger did not understand precisely why Chipwich was made a party to the Haagen-Dazs contracts, but he knew that Premium had undertaken to arrange for the marketing and distribution of Chipwiches, and he knew these contracts provided for that distribution, and he was fully capable of making further inquiry. Thus, the form of these contracts alone could not have reasonably caused him to believe that Donovan Leisure represented Chipwich.

Finally, with respect to the responses to the Thal letter, any reasonable impression that Metzger might have derived from the vague statements made at the December 23 meeting is more than offset by Metzger's background, knowledge and experience and his failure to procure clear assurance that Donovan Leisure would also represent Chipwich. Moreover, Metzger received from Stevens copies of the response to the Thal letter written by Donovan Leisure, in which Shaw explicitly stated that she wrote solely on behalf of Premium.

■ We therefore find that an attorney-client relationship did not arise by virtue of any reasonable belief of Metzger's. This view is strengthened by the fact that Donovan Leisure was never in a position in which it could have received Chipwich confidences or secrets from Metzger. Under the substantial relationship test, courts presume, on the basis of the attorney-client relationship, that the client has divulged confidences and secrets so that the success of a motion to disqualify will not depend upon disclosure. That test is obviously inappropriate when the relationship is such that no secret or confidential information could have passed from attorney to client. Cf. Allegaert v. Perot, 565 F.2d 246, 250 (2d Cir. 1977) (test not applied where there was attorney-client relationship, but client knew all information he disclosed would be conveyed to other parties).

■ Even assuming arguendo that Donovan Leisure incurred a fiduciary obligation by reason of some reliance that may have occurred, the substantial relationship has limited application here because Donovan Leisure was never in a position in which it could have received confidential information. Even if Donovan Leisure was in a position to receive Chipwich information from Stevens, it was not information which Chipwich might reasonably have assumed Donovan Leisure would withhold from Premium, and therefore it should not implicate the substantial relationship test.

In sum, Canon 4 does not disqualify Donovan Leisure.

■ We turn to a consideration of Canon 5. Canon 5, which requires the attorney to exercise independent judgment on behalf of a client, also rests on the attorney-client relationship. The Court should only disqualify an attorney under Canon 5 if there is a conflict of interest that "undermines the Court's confidence in the vigor of the attorney's representation of his client." *Board of Education v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979).

In light of the finding above that there was no attorney-client relationship between Donovan Leisure and Chipwich, the Court finds no violation of Canon 5 upon which to base disqualification.

■ Canon 9 proscribes "even the appearance of impropriety." Although the Canon itself represents a broad principle with which lawyers governing their own behavior must attempt to comply, unless the integrity of the action currently before the court is threatened by the appearance of impropriety, the courts must refrain from imposing the burdens of an attorney disqualification on a client and leave the matter to state or federal attorney disciplinary proceedings. This is the learning given us by the Court of Appeals in *Board of Education v. Nyquist*, which I have previously cited. *Id.* As the Court of Appeals for the Second Circuit stated: "When there is no claim that the trial will be tainted, appearance of impropriety is simply too

slender a reed on which to rest a disqualification order except in the rarest cases." *Id.* at 1247.

■ Having considered all of the circumstances presented at the hearing, we find no threat to the integrity of this case. We therefore find no disqualification under Canon 9.

Finally, Chipwich argues that Donovan Leisure's continued representation of Premium in this lawsuit would result in a violation of Disciplinary Rule 5-102 of the Code of Professional Responsibility. DR 5-102 provides:

"(A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he and a lawyer of his firm may testify in the circumstances enumerated in DR 5-101(B)(1) through (4).

"(B) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client."

The exceptions under DR 5-102(A) include those instances when the lawyer's testimony is uncontested or relates to a mere formality and when "refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case". DR 5-101(B)(1-4).

Chipwich contends that Doris Shaw "may be called upon to testify." Defendants' Memorandum in Support of Motion to Disqualify at p. 16. We find that DR 5-102 does not reach the circumstances of this case. Premium states that it has no need to call Shaw because she was not involved in any of the substantive actions underlying this litigation.

■ Chipwich cites *MacArthur v. Bank of New York,* 524 F.Supp. 1205 (S.D.N.Y. 1981) in support of its motion. But in the *MacArthur* case, the attorneys who were disqualified by the client's need to call them as witnesses had "participated actively in many of the contested events ... [making] the testimony of defendants' attorneys imperative." *Id.* at 1206–07 n.1. One of the attorneys in MacArthur had "acted as the lead negotiator and agent for the defendant in many of the contested events." Donovan Leisure's activities in this case, on the other hand, were little more than those of a scrivener, reducing to writing agreements entirely negotiated by Stevens. While its role with respect to the Thal letter may have been slightly broader, not only was that role acted out openly in front of Metzger, but it appears to be unrelated to the issues in this case and an unlikely source of testimony. It is thus far from "obvious" that Premium ought to call Shaw as a witness in its behalf, and DR 5–102(A) does not disqualify counsel.

DR 5–102(B) provides even less ground for the disqualification argument, since it permits an attorney who may be called as a witness by another party to continue "until it is apparent that his testimony is or may be prejudicial to his client." Even apart from the unlikelihood that Shaw would be a significant fact witness, it is certainly not apparent that her testimony, should Chipwich decide to call her as a witness, would prejudice Premium.

Moreover, a decision to call Shaw as a witness when her testimony, which of course we have had the benefit of hearing on this motion, appears insignificant, should trigger particularly strong reluctance to disqualify since Note 31 to DR 5–102(B) specifically condemns the device of calling opposing counsel as a witness in order to obtain disqualification. *See Rice v. Baron,* 456 F.Supp. 1361, 1370 (S.D.N.Y. 1978).

The Court therefore rejects the argument that Shaw's potential role as a witness should disqualify Donovan Leisure.

We are fully satisfied, for the reasons we have stated above, that, looking solely to this litigation standing alone, Donovan Leisure is not disqualified.

■ The question whether Donovan Leisure is for any reason disqualified from representing Premium in the Martin Ice Cream antitrust suit in which Chipwich and Premium are co-defendants is of course a question to be determined by the judge in that proceeding, should the issue there be raised. Chipwich urges, however, that the concurrence of the two litigations causes it to suffer prejudice if Donovan Leisure remains as counsel for Premium in this action. For several reasons we reject Chipwich's contentions in this regard.

First, we have grave doubts as to the wisdom of a rule which would enable a third party—here Martin Ice Cream—to trigger the disqualification of counsel in another proceeding by naming the plaintiff and the defendant in that action as co-defendants in a separate suit. The potential for mischief in such a rule appears obvious.

Second, it would seem that the problems of which Chipwich complains would be present regardless of the identity of counsel for Premium. No matter who represents Premium, the client and Chipwich will be in the ambivalent relationship of adversaries in one proceeding and co-defendants in another.

In sum, based on the present state of the record after a thorough evidentiary hearing, the Court denies the instant motion to disqualify Donovan Leisure as counsel.

We note, however, something which is obvious and true with respect to all such motions: That our ruling is predicated on the record in its present state. If subsequent discovery should alter the basic underpinnings of this ruling, the motion may be renewed. Motion for disqualification is denied.

So ordered.