**EMONS INDUSTRIES, INC., Plaintiff,**

v.

**LIBERTY MUTUAL INSURANCE COMPANY, Defendant.**

**No. 90 Civ. 5603 (PKL).**

United States District Court, S.D. New York.

Oct. 4, 1990.

Anderson, Kill, Olick & Oshinsky, P.C., New York City (John H. Doyle III, David M. Zensky, Elizabeth J. Millstein, of counsel), for plaintiff.

Cuyler, Burk & Matthews, New York City (Edwin R. Matthews, Stefano V. Calogero, of counsel), for defendant.

## ORDER & OPINION

LEISURE, District Judge:

This is an action for declaratory and injunctive relief, and for monetary damages, arising from defendant Liberty Mutual Insurance Company's ("Liberty") alleged breaches of its contractual and fiduciary duties owed to its insured, Emons Industries, Inc. ("Emons"). Liberty comes before the Court on a motion to disqualify Emons's counsel, Anderson, Kill, Olick & Oshinsky ("the Anderson Firm"), from representing Emons in the instant litigation.[1]

## BACKGROUND

Emons is a New York corporation primarily engaged in the boxcar leasing business. As the corporate successor to a number of pharmaceutical companies, Emons has been sued in numerous product liability cases arising out of the sale by those companies of diethylstilbestrol ("DES"). Liberty is a Massachusetts mutual insurance company and is Emons's insurer with respect to DES lawsuits pursuant to comprehensive general liability insurance policies ("Policies") issued by Liberty to Emons and its predecessors between 1945 and 1970.

In 1975 Emons was first sued in a DES-related lawsuit. Emons notified Liberty, and requested that Liberty defend Emons in the suit and indemnify Emons if Emons were found liable. Liberty refused the defense and coverage requests and Emons thereafter retained on its own behalf the firm of Greenberg, Irwin, Pellman & Slade ("the Greenberg Firm") to represent Emons in both the burgeoning number of DES lawsuits, as well as in a suit against Liberty seeking coverage under the Policies ("the Coverage Action").

In 1978, Emons and Liberty reached an interim settlement of the Coverage Action ("the Interim Settlement"), which provided that Liberty pay for Emons's costs in defending against the DES cases. Emons apparently continued to control its defense of the DES cases through counsel chosen by Emons. Through 1980 Emons was represented by the Greenberg Firm, which then split its membership and Emons's counsel became the firm of Slade, Pellman & Biehl. In 1982, Slade, Pellman & Biehl became Slade & Pellman. These firms successively represented Emons in the DES cases, with Liberty, pursuant to the Interim Settlement, paying all of Emons's defense costs. At the same time, these successive firm entities represented Emons in the Coverage Action against Liberty.

In 1988, Emons (represented by Slade & Pellman) and Liberty reached a final settlement of the Coverage Action ("the Settlement Agreement"), pursuant to which Liberty agreed to continue paying Emons's DES defense costs and to pay indemnification to Emons's subject to per claim and aggregate limits. In 1989, Slade & Pell-

---

1. In the complaint originally filed in this action, John F. Triggs, and the law firm of Jacobson & Triggs (the "Triggs Defendants"), were named as defendants. Pursuant to a stipulation entered into between Emons and the Triggs Defendants, and so ordered by the Court, Emons's claim against the Triggs Defendants was dismissed with prejudice on October 3, 1990.

man became Slade, Moross, Rahl, Glatzer & Stamm ("Slade Moross").

During April 1990, Jeffrey L. Glatzer, Esq., a Slade Moross partner, informed Liberty that Slade Moross would be merging with the Anderson Firm. On May 1, 1990, Slade Moross merged into the Anderson Firm, the Slade Moross attorneys involved in representing Emons prior to the merger continuing in that capacity as members of the Anderson Firm. On the same day as the merger, Liberty informed Mr. Glatzer that it would not agree to the Anderson Firm continuing in the role of DES counsel, which Slade Moross and its predecessor firms had served. Liberty stated as its basis for objecting to the Anderson Firm's involvement in unrelated policyholder actions against Liberty.

On July 25, 1990, Liberty informed Emons that Liberty was assigning defense of the DES cases to another firm, Jacobson & Triggs, and that if Emons refused to cooperate in the transfer of counsel Liberty would no longer defend Emons in the DES cases nor would it indemnify Emons under the Settlement Agreement or the Policies. On August 2, 1990, Emons brought suit against Liberty, Jacobson & Triggs and John F. Triggs in New York Supreme Court, County of New York, seeking a declaration of rights and a permanent injunction enjoining Liberty from interfering with Emons's attorney-client relationship with the Anderson Firm. Emons also sought monetary damages, including any unpaid defense or indemnity payments ("Coverage Payments") due Emons since May 1, 1990.

On August 13, 1990, Justice Ira Gammerman granted a request by Emons for a temporary restraining order preventing Liberty from interfering with Emons's relationship with the Anderson Firm, but refused to enjoin Liberty from withholding Coverage Payments pending a hearing on Emons's pending motion for a preliminary injunction. The case was subsequently removed to this Court, and Liberty now moves to disqualify the Anderson Firm from representing Emons in this action.

## DISCUSSION

Liberty premises its motion to disqualify the Anderson Firm on two separate grounds: 1) that Slade Moross's prior representation in the DES cases bars the Anderson Firm from prosecuting the present action; and 2) that one or more attorneys from the Anderson Firm will be necessary witnesses in this action and that role requires the disqualification of the Anderson Firm as a whole. The Court will deal with each of these points in turn.

In undertaking this analysis the Court secures guidance from the Second Circuit's teaching with respect to motions to disqualify counsel. "[W]hile we have not hesitated to disqualify counsel when the circumstances warranted it, we have also noted that 'there is a particularly trenchant reason for requiring a high standard of proof on the part of one who seeks to disqualify his former counsel, for in disqualification matters we must be solicitous of a client's right freely to choose his counsel—a right which of course must be balanced against the need to maintain the highest standards of the profession.' *Government of India v. Cook Industries, Inc.,* 569 F.2d 737, 739 (2d Cir.1978). This Court is also mindful of the considerations that disqualification motions 'are often interposed for tactical reasons,' and that 'even when made in the best of faith, such motions inevitably cause delay.' *Board of Education v. Nyquist,* 590 F.2d [1241,] 1246 (2d Cir.1979)." *Evans v. Artek Systems Corp.,* 715 F.2d 788, 791–92 (2d Cir.1983). Hence, a party moving to disqualify counsel "bear[s] the heavy burden of proving facts required for disqualification." *Artek, supra,* 715 F.2d at 794.

### 1) Conflict of Interest

Liberty's first argument for disqualifying the Anderson Firm in the present action stems from what it claims is a conflict of interest arising from Slade Moross's prior representation in the DES cases. At the heart of this argument is Liberty's assertion that "the attorneys retained by an insurer to defend claims against its insured represents [*sic*] both the insurer and the insured." Brief in Support of Liberty Mu-

tual Insurance Company's Motion to Disqualify ("Liberty Brief") at 12. From this proffered rule Liberty reasons that it—as well as Emons—was a client of Slade Moross, and thus it would be an impermissible conflict of interest for the Anderson Firm, as successor to Slade Moross, to now take a position in the instant action adverse to Liberty.

The applicable provision under the Disciplinary Rules of the Lawyers Code for Professional Responsibility ("the Code") is DR 5–108(A),[2] which became effective in New York on September 1, 1990.[3] This rule, although new, embodies the venerable "substantial relationship" test originally articulated by Judge Edward Weinfeld in *T.C. Theatre Corp. v. Warner Brothers Pictures, Inc.,* 113 F.Supp. 265, *reh'g denied,* 125 F.Supp. 233 (S.D.N.Y.1953). Under both the plain language of DR 5–108(A) and the "substantial relationship" test, a conflict of interest only arises when the party moving to disqualify is a former client of the adverse party's present counsel. DR 5–108(A); *T.C. Theatre Corp., supra,* 113 F.Supp. at 268. The inquiry must therefore turn to whether Liberty is a former client of Emons's counsel, thus bringing this case within the ambit of DR 5–108(A). *Cf. Premium Products Sales Corp. v. Chipwich, Inc.,* 539 F.Supp. 427, 433 (S.D.N.Y.1982) (threshold inquiry in case involving attorney's duty to preserve moving party's confidences is whether an attorney-client relationship ever existed between moving party and adverse party's counsel).

Liberty cites several cases in support of its proposition that the attorneys retained by an insurer to defend claims against its insured represent both the insurer and the insured. *Car and General Insurance Corp. v. Goldstein,* 179 F.Supp. 888 (S.D. N.Y.1959), *aff'd,* 277 F.2d 162 (2d Cir.1960); *Goldberg v. American Home Assurance Co.,* 80 A.D.2d 409, 439 N.Y.S.2d 2 (1981); *Liberty Mutual Insurance Co. v. Engels,* 41 Misc.2d 49, 244 N.Y.S.2d 983 (Sup.Ct. Kings County 1963), *aff'd,* 21 A.D.2d 808, 250 N.Y.S.2d 851 (2d Dep't 1964). However, these cases merely hold that in those instances where an insurance company originally retained and appointed counsel to represent the common interests of the insurer and insured, statements made to such counsel by the insured are not privileged from disclosure to the insurer.

Liberty, in contrast, did not originally retain and appoint counsel for Emons in the DES cases. Rather, Emons hired its own counsel, not only to defend the DES cases, but to prosecute Emons's Coverage Action against Liberty. The various predecessor firms to Slade Moross were each in turn retained by Emons, not by Liberty, and Liberty itself concedes in its reply brief that until the Settlement Agreement was entered into in 1988, Emons, and not Liberty, controlled the defense of the DES cases. Reply Brief in Support of Liberty Mutual Insurance Company's Motion to Disqualify the Law Firm of Anderson Kill Olick & Oshinsky ("Liberty Reply") at 2–3. The fact that Liberty paid Emons's counsel's fees does not lead to the conclusion that Liberty was a client of such counsel. *See Quintel Corp., N.V. v. Citibank, N.A.,* 589 F.Supp. 1235, 1239 (S.D.N.Y.1984) ("The payment of legal fees does not determine whether an attorney client relationship exists."). *See also* 1981 ABA Inf.Op. 1476 ("When a liability insurer retains a lawyer to defend an insured, the insured is the lawyer's client.... [The lawyer's] responsibilities exist even if a person other than

---

**2.** DR 5–108(A) reads as follows: "Except with the consent of a former client after full disclosure a lawyer who has represented the former client in a matter shall not: 1) Thereafter represent another person in the same of a substantially related matter in which that person's interests are materially adverse to the interests of the former client. 2) Use any confidences or secrets of the former client except as permitted by DR 4–101(C) or when the confidence or secret has become generally known."

**3.** While the Code's Disciplinary Rules were not intended to be used as rules governing disqualification motions, the Code nevertheless "provide[s] guidance for the courts in determining whether a case would be tainted by the participation of an attorney or a firm." *Armstrong v. McAlpin,* 625 F.2d 433, 446 n. 26 (2d Cir.1980) en banc, *vacated on other grounds,* 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981).

the client is paying the lawyer's fee."); *ABA/BNA Lawyer's Manual on Professional Conduct,* Ethics Opinion CI–866 ("attorney owes his obligation of loyalty to the insured party rather than the insurer notwithstanding that the insurer is paying."); DR 5–107(B) ("A lawyer shall not permit a person who ... pays the lawyer to render legal service for another to direct or regulate his or her professional judgment in rendering such legal services.").

■■■ Moreover, it is firmly established by the case law and commentators that where conflicts of interest between an insurer and its insured arise, such that a question as to the loyalty of the insured's counsel to that insured is raised, the insured is entitled to select its counsel, whose reasonable fee is to be paid by the insurer. *Klein v. Salama,* 545 F.Supp. 175, 179 (E.D.N.Y.1982); *Public Service Mutual Insurance Company v. Goldfarb,* 53 N.Y.2d 392, 400, 442 N.Y.S.2d 422, 427, 425 N.E.2d 810, 815 (1981); *Hartford Accident and Indemnity Co. v. Village of Hempstead,* 48 N.Y.2d 218, 228–29, 422 N.Y.S.2d 47, 54, 397 N.E.2d 737, 744 (1979); *Prashker v. United States Guarantee Co.,* 1 N.Y.2d 584, 154 N.Y.S.2d 910, 136 N.E.2d 871 (1956); *Penn Aluminum Inc. v. Aetna Casualty and Surety Co.,* 61 A.D.2d 1119, 402 N.Y.S.2d 877 (4th Dep't 1978). *See also Employers Insurance of Wausau v. Albert D. Seeno Construction Co.,* 692 F.Supp. 1150, 1155–57 (N.D.Cal.1988); *Point Pleasant Canoe Rental Inc. v. Tinicum Township,* 110 F.R.D. 166, 170 (E.D. Pa.1986); 7C Appleman *Insurance Law and Practice* § 4681 at 5 (1979 and 1990 supp.) ("Where the insurer lacks an economic motive for vigorous defense of the insured, or the insurer and insured have conflicting interests, the insurer may not compel the insured to surrender control of the litigation."). During the period preceding the Settlement Agreement, when Liberty disputed its obligations under the Policies, a conflict clearly existed between Liberty and Emons such that Emons was legally entitled to—and did—hire its own counsel and control its defense of the DES cases. Liberty was therefore not a client of Emons's counsel in the period before the Settlement Agreement was entered into.

The analysis now turns to whether the Settlement Agreement altered the relationship between Liberty and Emons's counsel (Slade & Pellman at the time the Settlement Agreement was signed, and subsequently Slade Moross) such that Liberty became a client of that counsel. The Court finds that no such transformation of that relationship occurred.

To begin, there is no evidence that on any occasion before or after the Settlement Agreement was signed did Liberty seek or obtain any legal advice from Slade Moross or its predecessor firms, a fact strongly suggesting that Liberty did not consider those firms its counsel. *See Premium Products, supra,* 539 F.Supp. at 433. Furthermore, Liberty does not dispute Emons's assertion that Slade & Pellman and Slade Moross attorneys represented Emons in negotiations with Liberty regarding the interpretation and application of the Settlement Agreement.

The relevant language in the Settlement Agreement bolsters the conclusion that no change in the relationship between Liberty and Emons's counsel was caused by the signing of that agreement such that Liberty became a client of that counsel.[4] In

---

4. Section 5.6 of the Settlement Agreement reads as follows: "Liberty and Emons agree that they are satisfied with the manner in which the DES actions have been defended. Liberty and Emons intend to have the defense of the DES actions continue in its present manner so long as quality representation is being provided in a cost effective manner. To the extent these criteria are met, Liberty shall continue to use Slade & Pellman as lead and coordinating counsel on behalf of Emons, and local counsel shall be used as attorneys of record where necessary outside of New York State. The determination as to whether the criteria are being met shall be made by Liberty after consultation with Emons and after taking into account Slade & Pellman's representation of Emons not only in DES matters, but also in Emons' bankruptcy proceedings and other corporate matters which affect and are affected by Emons' involvement in DES actions. Emons will insure that lead counsel: (i) shall provide Liberty with copies of all correspondence between Emons and lead counsel, and lead counsel and local counsel relating to

Section 5.6, the parties state that they "intend to have the defense of the DES actions continue in its present manner," with Slade & Pellman acting as lead and coordinating counsel "on behalf of Emons." Needless to say, this language indicates maintenance of the *status quo*. In addition, Section 5.6 requires that Emons provide certain information to Liberty regarding the ongoing DES actions. While Liberty argues that these requirements were obligations owed by Jeffrey Glatzer and Slade Moross to Liberty, (Liberty Brief at 18 n. 7), it is clear that the obligation was owed by *Emons*, rather than by Slade Moross, and thus this provision in no way indicates an attorney-client relationship between Liberty and Slade Moross. Indeed, the fact that Emons was to provide this information, rather than Slade Moross, suggests the absence—and not the presence—of an actual attorney-client relationship between Liberty and Slade Moross.

While Section 5.6 does provide Liberty with a right to determine whether Emons's counsel is providing "quality representation" in a "cost effective manner," such determination must be made after consulting Emons. This provision does not render Liberty a client of its insured's counsel, but rather embodies the obvious limitation established in the case law that an insurer need only pay the "reasonable" fees of its insured's attorneys. *See, e.g., Goldfarb, supra*, 53 N.Y.2d at 400, 442 N.Y.S.2d at 427, 425 N.E.2d at 815. Indeed, the determination as to whether these criteria are being met must, by the terms of Section 5.6, consider "Slade & Pellman's representation of Emons" in DES and other matters. The language is notably silent regarding any consideration of counsel's rep-

resentation of *Liberty*, which is consistent with a conclusion that no such representation existed.

Finally, Emons has provided persuasive arguments that the interests of Emons and Liberty continue to conflict with respect to the defense of Emons in the DES cases. (Grossman Aff. ¶¶ 25–30). In brief, Liberty's relatively low per claim indemnification limits and annual aggregate limits, as well as the fact that Liberty will not be liable for any punitive damage claims against Emons, have created a real possibility of conflict of interest in choosing and pursuing defense strategies. *See, e.g., Goldfarb, supra*, 53 N.Y.2d at 400, 442 N.Y.S.2d at 426–27, 425 N.E.2d at 814–15 (noting that punitive damages may not be insured against under New York law, and thus holding that the insurer's interest in defending a suit containing such a claim was in conflict with the insured's interest, and thus the insured was entitled to defense by an attorney of his own choosing, to be paid by the insurer). Hence Liberty should not—and cannot—be deemed to have been a client of Slade Moross or any of its predecessor firms, and therefore no present conflict of interest arises from the Anderson Firm's representation of Emons in the instant action.[5]

### 2) Attorney as Witness

■ Liberty has also argued that the Anderson Firm should be disqualified from representing Emons in the present action because certain members of the Anderson Firm may themselves be witnesses in the action. Through inadvertence or purposeful neglect, Liberty largely relies in its brief dated September 14, 1990, on provi-

---

the DES lawsuits and with quarterly reports as to the status of and developments in each DES lawsuit or such other status reports as Liberty may require; (ii) shall advise Liberty as soon as possible of all important developments in each pending DES action; (iii) shall provide Liberty with all information requested by Liberty; and (iv) shall provide Liberty with access to all materials in their files pertaining to each pending DES action."

**5.** Liberty at one point in its brief refers to Disciplinary Rule 5–105 in arguing that the Anderson

Firm should be disqualified from representing Emons in this action, Liberty Brief at 14–15, although the bulk of Liberty's argument focuses on Slade Moross's *former* representation of Emons. DR 5–105 addresses conflicts of interest between two *present* clients. The Court's finding that Liberty was not a client of Slade Moross applies equally to the present relationship between Liberty and the Anderson Firm. Since Liberty is not a client of the Anderson Firm, it necessarily follows that no conflict of interest exists under DR 5–105.

sions of the Disciplinary Rules that have been superseded by new Rules effective September 1, 1990.[6] Under the new version of DR 5–101(B), only the individual attorney-witness who will testify is disqualified, with his or her firm free to continue to represent its client.[7]

The question is, therefore, whether Emons's trial attorneys in this matter, John H. Doyle, Esq., and David M. Zensky, Esq., "ought" to testify in the present litigation. "[W]hether a witness 'ought' to testify is not alone determined by the fact that he has relevant knowledge or was involved in the transaction at issue. Disqualification may be required only when it is likely that the testimony to be given by the witness is necessary." *S & S Hotel Ventures Limited Partnership v. 777 S.H. Corp.*, 69 N.Y.2d 437, 445–46, 515 N.Y.S.2d 735, 739, 508 N.E.2d 647, 651 (1987) (reversing Appellate Division's disqualification of attorney under attorney-witness rule), citing *J.P. Foley & Co., Inc. v. Vanderbilt*, 523 F.2d 1357, 1359 (2d Cir.1975). *See also Barrie v. Jacobs*, 120 B.R. 704 (S.D.N.Y. 1989). The Anderson Firm has submitted an affidavit stating that it is neither likely nor necessary that Mr. Doyle testify at the forthcoming preliminary injunction hearing. The arguments made by Liberty that Mr. Doyle may testify are presently too speculative to warrant disqualification of him, and no suggestion is made by Liberty that Mr. Zensky will be a necessary witness. Although Mr. Doyle was involved in reviewing potential conflicts of interest incident to the merger of Slade Moross and the Anderson Firm, that fact does not at this time render him a "necessary" witness with respect to Emons's estoppel and reliance claims, as Jeffrey Glatzer's communications with Liberty apparently form the basis of those claims. Disqualification of Mr. Doyle or Mr. Zensky, or the entire Anderson Firm for that matter, would thus be inappropriate.

## CONCLUSION

For the reasons stated above, Liberty's motion to disqualify the Anderson Firm as counsel for Emons in the above-captioned action is denied.

SO ORDERED.

---

**6.** The relevant Disciplinary Rule, DR 5–101(B), now reads as follows: "A lawyer shall not act, or accept employment that contemplates the lawyer's acting, as an advocate before any tribunal if the lawyer knows or it is obvious that the lawyer ought to be called as a witness on behalf of the client...."

**7.** Liberty also cites Rule 3.7(b) of the Model Rules of Professional Conduct in support of its motion. However, the Disciplinary Rules, and not the Model Rules, are the primary source of guidance for the courts with respect to questions of attorney conduct. *See United States v. Kwang Fu Peng*, 766 F.2d 82, 86 n. 1 (2d Cir. 1985); *Polycast Technology Corp. v. Uniroyal, Inc.*, 129 F.R.D. 621, 623–25 (S.D.N.Y.1990).