**AMERICAN SPECIAL RISK INSURANCE COMPANY,**
**Plaintiff,**

v.

**DELTA AMERICA RE INSURANCE CO., DR Insurance Company, and National Distillers & Chemical Corporation, Defendants.**

No. 84 Civ. 1329 (PNL).

United States District Court, S.D. New York.

March 31, 1986.

LeBoeuf, Lamb, Leiby & MacRae, New York City, for plaintiff.

Breed, Abbott & Morgan, New York City, for defendants.

## OPINION AND ORDER

LEVAL, District Judge.

This is a breach of contract action arising out of various reinsurance contracts between plaintiff American Special Risk Insurance Corp. ("ASRIC") and defendant Delta American Re Insurance Company ("Delta"). ASRIC is a Delaware corporation with its principal place of business in Georgia. Delta is a Kentucky corporation with its principal place of business in New York. Additional defendants DR Insurance Co. ("DR"), and its parent corporation, National Distillers and Chemical Corp. ("National"), both Virginia corporations with their principal places of business in New York, were added by plaintiff's amended complaint.

Defendants move to dismiss on the basis of forum non conveniens arguing that England is a more convenient forum. They also move for an order disqualifying plaintiff's counsel, LeBoeuf, Lamb, Leiby & MacRae ("LeBoeuf").

### I. *Background*

#### A. *1979–81 Events: The Underlying Insurance and Reinsurance Contracts*

This action involves an elaborate arrangement of products liability insurance and reinsurance for various trade associations. The complaint alleges breaches of different reinsurance contracts entered into in 1979–80 between ASRIC and Delta, a member of a non-marine reinsurance syndicate.

Alexander & Alexander, Inc. ("A & A"), an American insurance broker, designed a program to market products liability insurance to various trade associations. After A & A gathered data regarding each trade association, it established insurance rates based on a maximum volume of business activity.

A & A approached Alexander Howden Insurance Brokers Ltd. ("AHIB"), an English insurance broker, to secure coverage for the trade association members. In 1979, AHIB arranged for its American subsidiary, ASRIC (then Cranford Insurance Co.), and a related company, Drake Insurance Co., to cover the first layer of insurance for the products liability program.[1]

AHIB then sought reinsurance for AS-RIC and Drake. Under American insurance law, an insurer can write insurance only up to a certain amount determined by its assets. However, if the insurer obtains reinsurance whereby its risk in the direct insurance is insured by another company, the direct insurer may be able to obtain reinsurance credit permitting the insurer to take on additional risk coverage. AHIB contacted Charman Mauduit, a London reinsurance intermediary, to locate reinsurance for ASRIC and Drake. In the fall of 1979, Charman Mauduit approached Stetzel Thomson ("Stetzel"), an English company with its principal place of business in London, to secure reinsurance for ASRIC and Drake.

In 1979, Stetzel managed various reinsurance syndicates. Each member of the syndicate signed an Agency Agreement under which Stetzel had authority to reserve reinsurance business, collect premiums and distribute accounts for each syndicate member. Each member would ordinarily be liable for a percentage of the total risk of the syndicate.

During 1979–80, Stetzel, acting as agent for its non-marine reinsurance syndicate, accepted reinsurance coverage of ASRIC and Drake. Delta (then named Elkhorn Re Insurance Co.) was one of 22 members of this non-marine reinsurance syndicate. Delta was the only member incorporated in the United States and licensed to do business in New York. The other syndicate members were located primarily in Europe, Latin America and Bermuda.

During 1979 and 1980, Delta's share of the syndicate's total liability was 4.88% and 2.85% respectively. However, ASRIC contends that Stetzel designated Delta as the "fronting" company in accepting reinsurance coverage of ASRIC and Drake,[2] and therefore Delta is liable for 100% of the syndicate's total liability. Under the Agency Agreement between Stetzel and the syndicate members, Stetzel had the authority to reserve reinsurance business for the syndicate in the name of a single syndicate member. That member would be 100% liable to the reinsured and would have a right of indemnification against the other syndicate members for their designated share of the syndicate's total liability.

ASRIC claims Delta was chosen to front the syndicate because it was the only American insurer in the syndicate. Under the Insurance Code of Delaware, ASRIC's state of incorporation, an insurer will receive reinsurance credit only if the reinsurer is licensed to transact insurance in Delaware or in another state that conforms to the same standards of solvency for insurance companies. If the reinsurer is an unincorporated alien insurer, the reinsured can obtain reinsurance credit only if the reinsurer establishes a trust fund here for the benefit of the reinsured. According to ASRIC, the rule is the same in New York and virtually every other state. Thus, by having Delta front the syndicate, the other syndicate members avoided having to post security in the United States.

Stetzel handled the negotiation and execution of the ASRIC reinsurance contracts

---

1. ASRIC explains that because of the high risk involved, many layers of insurance are needed to cover these trade associations.

2. When Stetzel reserved business on behalf of the syndicate, it initialed the slips "N.B." AS-RIC apparently intends to prove that this was a symbol for Delta.

for the whole syndicate. ASRIC and AHIB, ASRIC's English parent, dealt with Stetzel through Charman Mauduit, ASRIC's English agent. Generally, neither ASRIC nor AHIB dealt directly with Delta in securing reinsurance coverage for ASRIC and Drake. However, ASRIC claims that neither AHIB nor Charman Mauduit had authority to bind ASRIC to any contract without ASRIC's, or subsequently A & A's, approval.[3]

According to ASRIC, there was a consistent pattern of negotiations between it and Delta via their London agents concerning the rate structures of each association for which ASRIC sought reinsurance coverage. Stetzel, on behalf of Delta and the syndicate members, had to agree to the rate structures for the direct insurance before it accepted the reinsurance coverage.[4] It appears from both Delta's and ASRIC's papers that Delta did not participate directly in any of these negotiations.

The reinsurance contracts were ultimately perfected in the following manner. Charman Mauduit presented Stetzel with a "slip", a summary of the terms and conditions of the reinsurance. Stetzel then reserved each item of reinsurance on behalf of the non-marine syndicate by placing an appropriate stamp on the slip. This reservation was usually subject to later confirmation by the syndicate members. In some instances, however, Stetzel simply initialed certain "declarations" presented to it by Charman Mauduit. According to Delta, Stetzel never confirmed any of these declarations with the syndicate members.

Stetzel also endorsed the slips with the stamp "Sub R/I." According to an affidavit submitted by Delta's English counsel, this legend means that the reinsurance described in the slip will not become effective until further reinsurance is secured for the

reinsured. This re-reinsurance is called "retrocession." Whenever Stetzel endorsed the slip "Sub R/I," Charman Mauduit in England arranged for the retrocession for the non-marine syndicate. Six companies agreed to act as retrocessionaires for the syndicate. Three of these companies are American, but only one company is licensed to do business in New York.

Once Stetzel received notice of the retrocession coverage, it usually confirmed the items of reinsurance with each syndicate member. Stetzel apparently sent each member summaries of the items of reinsurance and a description of the member's share of the total risk. The member then initialed the summaries and returned them to Stetzel. Once each syndicate member agreed to the item of reinsurance, Stetzel sent Charman Mauduit a broker's confirmation.

The insurance and reinsurance appear to have been performed in the following manner. The original insureds reported their claims and paid their premiums to A & A who referred all the claims to its New York law firm which kept the files on the claims. Stetzel collected all the premiums for the reinsurance contracts from ASRIC and Drake and paid out all the claims to the reinsureds.

### B. *1982–85 Events: Purchase of Delta and Assumption of Delta's Liabilities*

Prior to September 1983, Delta (then named Elkhorn Re Insurance Co.) was owned by National. In September 1983, National sold Delta to Delta Holdings pursuant to a Stock Purchase Agreement dated September 30, 1983.[5] However, under the terms of this Agreement, Delta's rein-

---

**3.** On September 1, 1980, A & A became the general managing agent for ASRIC.

**4.** According to Peter Polstein, a Unit Manager at A & A during 1980, A & A sent detailed reports and proposed rates for each association to Stetzel via AHIB and Charman Mauduit in England. AHIB then relayed to ASRIC and A & A Stetzel's responses to these proposed rate structures.

There were also separate negotiations with respect to policies for association members whose dollar volume of business was above the limits in the charts or whose loss history was above average.

**5.** After the sale, Elkhorn's name was changed to "Delta Re Insurance Co."

surance liabilities placed by Stetzel (including those at issue here) were not transferred to Delta Holdings. Instead, National agreed to form a captive subsidiary company which would assume, *inter alia,* these reinsurance obligations. It also agreed to transfer from Delta to DR sufficient funds to cover the expected losses from the reinsurance business. See Stock Purchase Agreement at ¶ 10(a).[6] National then formed DR which in turn assumed full responsibility for Delta's reinsurance obligations by an Agreement of Bulk Reinsurance dated September 30, 1983.

ASRIC's New York agent informed Delta in early 1983 that losses exceeding $1.7 million from the reinsurance contracts had not yet been paid. Negotiations ensued in an attempt to resolve the problem. After Delta was sold to Delta Holdings, National and DR replaced Delta in the reinsurance discussions. In early 1984, National and DR notified ASRIC for the first time that they disputed the validity of the Delta/ASRIC reinsurance contracts.

In February 1984, ASRIC filed its original complaint against Delta alone. On May 29, 1985, the Kentucky Insurance Commissioner had Delta placed in rehabilitation because of concern over its solvency. In June 1985, ASRIC amended its complaint to include claims against DR and National in addition to Delta. The amended complaint alleges, *inter alia,* that DR is liable to ASRIC because it assumed Delta's reinsurance obligations; that Delta continues to be liable to ASRIC as a surety for the reinsurance obligations; that National tortiously impaired the performance of ASRIC's reinsurance contracts with Delta by the way it structured the sale of Delta to Delta Holdings; and that ASRIC is an intended third-party beneficiary of promises made by National in the Stock Purchase and Bulk Reinsurance Agreements.

---

**6.** National also agreed to capitalize DR at $5–6 million. See Stock Purchase Agreement at ¶ 12. In addition, it guaranteed that Delta's value as of September 30, 1983 was not less than $18 million, see Stock Purchase Agreement at ¶ 12;

## II. *Forum Non Conveniens Motion*

### A. *The Applicable Standard*

The Supreme Court in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 507–09, 67 S.Ct. 839, 842–43, 91 L.Ed. 1055 (1947) outlined the various private and public interest factors to be applied in determining whether to dismiss an action for forum non conveniens. The private interests include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining willing, witnesses; . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Id.* at 508, 67 S.Ct. at 843. The public interest factors concern "problems of court congestion, jury duty, local interest in the controversy and the advantages of having a court familiar with the law which is being applied." *Manu Int'l, S.A. v. Avon Products, Inc.,* 641 F.2d 62, 65 (2d Cir.1981) (citing *Gulf Oil,* 330 U.S. at 508–09, 67 S.Ct. at 843).

The weight of these factors and the application of the doctrine are left to the discretion of the district court. *Gulf Oil,* 330 U.S. at 508, 67 S.Ct. at 843. However, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Id.* at 508, 67 S.Ct. at 843; see also *Manu,* 641 F.2d at 65; *Calavo Growers of Calif. v. Belgium,* 632 F.2d 963, 969 (2d Cir.1980) (Newman, J., concurring), *cert. denied,* 449 U.S. 1084, 101 S.Ct. 871, 66 L.Ed.2d 809 (1981). Moreover, the "balance must be even stronger when the plaintiff is an American citizen and the alternative forum is a foreign one." *Olympic Corp. v. Societe Generale,* 462 F.2d 376, 379 (2d Cir. 1972); see also *Gibbons v. Udaras na Gaeltachta,* 549 F.Supp. 1094, 1121 (S.D.N.Y.1982). This Circuit has also noted that only in the unusual case would dismissal be warranted if the plaintiff has chosen a fo-

---

if Delta's value was actually less than that amount, DR would assume responsibility for insurance claims sufficient to restore the value to $18 million, see Agreement of Bulk Reinsurance at ¶ 4.

rum where the defendant resides. See *Manu,* 641 F.2d at 67 (citing *Schertenleib v. Traum,* 589 F.2d 1156, 1164 (2d Cir. 1978)). Since ASRIC is an American corporation and the defendants are incorporated in the United States and apparently have their principal places of business in New York,[7] defendants bear a heavy burden in proving that New York is an inconvenient forum.

█ I conclude, after weighing all the relevant factors discussed below, that that there are sufficient contacts in New York to sustain the plaintiff's choice of forum.

### B. *Application of the Gulf Oil Factors*

#### 1. *Private Interests*

a. *Access to Documents and Witnesses:* Defendants contend that all of the relevant witnesses and documents relating to the underlying reinsurance contracts are located in England. These witnesses are or were employees of Charman or Stetzel and currently are English citizens and residents. They are, therefore, beyond the court's subpoena power. Moreover, Stetzel has all the documents relating to the negotiation and formation of the reinsurance contracts in its London office. Defendants argue that access to these witnesses and documents in England is especially critical given the nature of the issues they intend to raise at trial, including, the propriety of Stetzel's contracting with ASRIC's English agent; the significance of Stetzel initialing of the reinsurance slips; the amount of money already paid ASRIC by Stetzel; and whether ASRIC's English agent misrepresented the risks involved in the underlying contracts.

█ Several factors undercut Delta's argument concerning the accessibility of its witnesses and documents. First, the forum non conveniens analysis must be examined in light of the ease of modern jet travel and telecommunications. See *Manu,* 641 F.2d at 65; *Calavo Growers,* 632 F.2d at 969 (Newman, J., concurring). In addition, testimony of witnesses in England who are beyond the court's subpoena power may be provided by depositions taken pursuant to letters rogatory. See *Overseas Programming Companies v. Cinematographische Commerzanstalt,* 684 F.2d 232, 235 (2d Cir.1982); *Thomson v. Palmieri,* 355 F.2d 64, 66 (2d Cir.1966).

Second, there are various witnesses and documents in the United States (especially New York or Georgia) that ASRIC contends it will need at trial. For example, some New York or United States witnesses have personal knowledge of the preparation of the risk information regarding the original insureds, the formation of the original insurance contracts and the settling of the original insureds' claims.[8] ASRIC also notes that it has already transferred AHIB's files from England to New York. It further notes that since Charman Mauduit's and Stetzel's files are generally derivative of AHIB's and A & A's files, most of the necessary documents are now in New York.

In addition, the amended complaint asserts claims against National and DR based on actions taken and contracts entered into by these defendants in the United States and especially New York. Proof of these claims will require testimony from witnesses and review of documents located in New York and the United States. Although this evidence will not be needed until ASRIC has established Delta's underlying liability, nevertheless the presence of these claims is a factor weighing in favor of this forum. Finally, ASRIC claims it

---

**7.** Defendants have not disputed ASRIC's claim that they each have their principal place of business in New York.

**8.** Defendants note they do not intend to challenge the payment of the claims to the original insureds or the representation of the risks for the original insurance contracts between ASRIC and the trade association members. Apparent-

ly, they will challenge only representations made by ASRIC and its English agent to Stetzel in London. Nonetheless, the United States witnesses and documents may be relevant since the original insureds' claims histories must be compared with the representations made to Stetzel by plaintiff's English agent to show or rebut allegations of misrepresentation by plaintiff.

will argue at trial that Delta either waived or should be estopped from asserting any invalidity or misrepresentation defenses because of certain actions it took after negotiations had begun on the outstanding reinsurance debts. Regardless whether these waiver claims are weighty, they do raise factual questions involving documents and witnesses located in New York or the United States generally.

b. *The Ability to Join All Interested Parties:* Defendants contend that England is the only forum where all interested parties could be joined. Delta has rights of indemnification against the other syndicate members and the retrocessionaires. According to defendants, only one of these potential third-party defendants is subject to suit in New York, but that all can be sued in England.

Defendants further note that they may be subject to inconsistent judgments if their liability is determined in the United States. In *Bedford Ins. Co. v. Instituto De Reassaguros Do Brasil,* [1984] 1 Lloyd's Rep. 210, a British trial court held that reinsurance contracts were illegal and unenforceable if one party to the contract was not licensed to transact insurance business in England. This decision may render ASRIC's reinsurance contracts unenforceable in England since ASRIC was not licensed there. The *Bedford* ruling is, however, open to question since it was rendered by a trial court with no appeal taken and another English court of coordinate jurisdiction [9] has rejected it, upholding a reinsurance contract between a licensed insurer and an unlicensed reinsurer.

The inability to implead third-party defendants "is a factor which weighs against retention of jurisdiction in the Southern District of New York." *Fitzgerald v. Texaco, Inc.,* 521 F.2d 448, 453 (2d Cir.1975), *cert. denied,* 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 641 (1976). However, courts have refused to dismiss for forum non conveniens in such circumstances. See, e.g., *Olympic Corp.,* 462 F.2d at 379. Delta's inability to implead third-party defendants must also be viewed in light of the fact that for its own benefit it fostered the arrangement making it primarily liable to ASRIC by assuming the position as fronting company. It therefore ran the risk of having to reimburse ASRIC under the reinsurance contracts before being able to sue the other syndicate members and the retrocessionaires for indemnification.

### 2. Public Interest Factors

a. *Application of Foreign Law:* Defendants contend that English law governs the interpretation and effect of the reinsurance contracts and therefore it would be more appropriate to have an English court interpret its own law. They also note that England has a strong interest in deciding this action given the *Bedford* controversy discussed above.

There is a likelihood that the reinsurance contracts should be governed by English law. They were apparently negotiated and accepted in England by the parties' English agents and payment of monies apparently was to take place there.[10] These factors might mean England has the most significant relationship with the controversy under New York's grouping of the contacts approach in conflicts of law issues. See *Index Fund, Inc. v. Insurance Co. of North America,* 580 F.2d 1158 (2d Cir. 1978), *cert. denied,* 440 U.S. 912, 99 S.Ct. 1226, 59 L.Ed.2d 461 (1979); *Auten v. Auten,* 308 N.Y. 155, 124 N.E.2d 99 (1954). Other factors, however, weigh in favor of applying either New York or another state's law. For example, the contracts were entered into by English agents on behalf of American principals. Moreover, they reinsured an American company for

---

**9.** See *B.A. Stewart v. Oriental Fire and Marine Ins. Co.,* April 18, 1984.

**10.** The Agency Agreement between Stetzel and Delta provided that Stetzel would handle the payment of all claims under the reinsurance contracts. ASRIC notes that the reinsurance slips provided that all claims would be presented to A & A's law firm in New York. Presumably, these claims would then be presented to Stetzel in London for payment.

American risks and Delta was specifically chosen as the fronting company because it was incorporated in the United States and regulated by New York and Kentucky laws.

■ Even assuming English law applies, dismissal is not warranted. The problem of applying foreign law is one factor to support dismissal under the forum non conveniens analysis. See *Calavo Growers, supra*, 632 F.2d at 967 (2d Cir.1980). However, this factor has been held insufficient to justify dismissal where other sufficiently significant factors weigh against dismissal. *Olympic Corp.*, 462 F.2d at 379; *Italian Int'l Bank v. Banco Industrial De Venezuela*, 83 Civ. 5288 (PNL), slip op. at 7 (S.D.N.Y., June 5, 1984) [Available on WESTLAW, DCTU database]. This court has also recognized that English laws "spring from the same tradition as our own and are likely to be easily comprehended by counsel and the court." *Esteca Armadora v. USM Corp.*, 82 Civ. 2852 (PNL), slip op. at 5 (S.D.N.Y., March 1, 1983).

*b. The Interests of New York and England in the Resolution of This Dispute:* Delta argues generally that England is most interested in the resolution of this suit because the action involves the regulation of the London reinsurance market. England also has a further interest in deciding whether the *Bedford* defense discussed above should apply to this type of action. New York, however, also has an interest in this suit. The risks covered are United States risks. Delta was chosen as the fronting company because it was incorporated in the United States and regulated by the laws of New York and Kentucky. New York has an interest in assuring that fronting companies licensed to do business in the state pay their debts.

*3. Conclusion*

Based on the above factors, I conclude there is no reason to disturb the plaintiff's choice of forum. Dismissal is especially unwarranted given the existence of the actions against DR and National and the fact that Delta intentionally adopted the fronting role so as to get the reinsurance business.[11] Although ASRIC also may have benefitted from the choice of Delta as the fronting company, there was nevertheless a corresponding benefit to Delta as a member of the syndicate.

Moreover, it makes little sense to hold that England is the more convenient forum for resolution of the underlying claims against Delta alone and then have the English court resolve the claims against National and DR which are based on American contracts and governed by United States law. Alternatively, it would be inefficient for ASRIC to litigate its claims concerning the underlying reinsurance contracts in England and then return to the United States to litigate its claims against National and DR for payment.

Defendants' motion to dismiss for forum non conveniens is denied.

## III. *The Disqualification Motion*

### A. *Background and Contentions*

In the fall of 1983, Sidney Pine, Martin Nilsen and Bruce Wright, then of the firm of Trubin, Sillcocks, Edelman & Knapp, represented Delta Holdings during its negotiation to purchase Delta (then Elkhorn Re Insurance Co.) from National. They continued to represent Delta Holdings and its new subsidiary after the sale. In February 1984, ASRIC, represented by Le-

---

**11.** I do not believe *Calavo Growers, supra*, 632 F.2d 963, mandates a different result. *Calavo Growers* was a suit by an American corporation for payment under an insurance contract with a foreign insurance syndicate. The contract was negotiated in Europe by European citizens. The Second Circuit upheld the district court's finding that Belgium was a more convenient forum although it noted that another result might still have been reasonable. *Id.* at 968. Unlike the present case, however, in *Calavo* all 18 syndicate members were foreign corporations who were equally liable to the insured. Here, Delta, a American corporation, apparently agreed to act as the fronting company for the rest of the syndicate members. In addition, this case involves additional claims between ASRIC and DR and National based on contracts negotiated and executed within the United States.

Boeuf, instituted the instant action against Delta.

Subsequently, in June 1984, Pine, Wright and Nilsen left Trubin, Sillcocks and joined LeBoeuf (Pine and Wright as partners). LeBoeuf was then hired to represent the Delta entities. According to plaintiff, before these attorneys joined LeBoeuf there were discussions within the firm and with ASRIC, Delta Holdings and Delta, concerning LeBoeuf's representation of both AS-RIC and Delta in light of ASRIC's suit against Delta. Plaintiff has submitted affidavits from Mr. John J. Ryan, currently President of Delta Holdings, Senior Vice President of American Risk Management, Inc. (which manages the Delta entities) and previously President of Delta until June 1985, and from Mr. William Wall, President of ASRIC, stating that at the time LeBoeuf took on representation of Delta they were aware of the suit by ASRIC against Delta and of LeBoeuf's representation of ASRIC in this action. They also assert that they never felt Delta's interests to be contrary to ASRIC's because Delta would never be held liable for the reinsurance obligations in light of the assumption of its reinsurance obligations by DR.

Since June 1984, LeBoeuf has represented Delta Holdings in a variety of matters.[12] In addition, LeBoeuf represented, and continues to represent, Delta in the Kentucky Insurance Commission rehabilitation proceedings. However, National's and DR's counsel, Breed, Abbott & Morgan, have represented Delta in this action since it was filed in February 1984.[13]

■ Defendants contend that LeBoeuf must be disqualified as ASRIC's counsel for the following reasons: First, because LeBoeuf represented, and continues to represent, Delta in the Kentucky rehabilitation proceedings, under Canon 4 of the ABA Model Code of Professional Responsibility, the firm must be disqualified from suing Delta in a substantially related action to prevent the possibility that LeBoeuf will use Delta's confidences to the latter's disadvantage. Second, because LeBoeuf currently represents Delta, it should be disqualified from suing its own client under Canon 5. Third, because LeBoeuf attorneys, Nilsen, Wright and Pine, represented Delta Holdings in its purchase of Delta from National and, according to defendants, were active in the negotiation and drafting of the Stock Purchase and Bulk Reinsurance Agreements, these attorneys are disqualified under Canon 5 and DR 5–102(A) because their testimony will be critical at the trial to establish the parties' intent behind the Agreements.[14]

### B. Canon 4 Issues

Canon 4 provides that an attorney must preserve the secrets and confidences of his client. This rule has given rise to the well-settled principle that an attorney may not represent an individual in an action against a former client if the action is substantially related to the subject matter

---

**12.** LeBoeuf initially represented Delta Holdings in a suit against National arising out of Delta Holdings' purchase of Delta, which was filed in this district in June 1985. See *Delta Holdings v. National Distillers and Chem. Corp.*, 85 Civ. 3439 (JFK). In that action, Delta Holdings alleges that National mislead or defrauded it during the course of the sale of Delta. LeBoeuf withdrew from representation of ASRIC in that action because, according to LeBoeuf, it feared that another LeBoeuf client, American Risk Management ("ARM"), might be brought into the suit by National. Subsequent to LeBoeuf's withdrawal, National impleaded ARM. LeBoeuf is currently representing ARM in that case.

**13.** ASRIC contends that National had agreed in the Stock Purchase and Bulk Reinsurance

Agreements to defend Delta in any actions filed against it concerning the Stetzel Thomson reinsurance obligations. See Affidavit of John J. Ryan at ¶ 4.

**14.** Defendants also argue that because LeBoeuf represents Delta Holdings and National is a minority shareholder of Delta Holdings, LeBoeuf is disqualified as to National. I find no merit to this argument since it would mean that a corporation's attorney could never sue one of its client's shareholders. Moreover, because National is only a minority shareholder in Delta Holdings, there is no claim that National and Delta Holdings are in fact one and the same entity and therefore LeBoeuf's suit against National is in fact one against its client Delta Holdings.

of the former client's representation. See *NCK Organization Ltd. v. Bregman*, 542 F.2d 128 (2d Cir.1976); *Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir.1975); *Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562, 570 (2d Cir.1973); *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.*, 113 F.Supp. 265, 268 (S.D.N.Y.1953); Model Rule 1.9 of the Model Rules of Professional Responsibility. The purpose of this prophylactic rule is "to prevent any possibility, however slight, that confidential information acquired from a client during a previous relationship may subsequently be used to the client's disadvantage." *Emle, supra*, 478 F.2d at 571.

This Circuit has held, however, that the substantial relationship test is inapplicable to situations where a law firm's alleged disqualification arises out of simultaneous representation of two clients if each client was aware of the other's relationship to the firm and had no reason to believe that confidences of one party would be withheld from the other. See *Allegaert v. Perot*, 565 F.2d 246, 250–51 (2d Cir.1977); *Neiman v. Local 144*, 512 F.Supp. 187, 189 (S.D.N.Y.1981). This rule has been followed in other cases where the complaining former client imparted confidential information to the law firm when it was aware of the firm's representation of the now adverse party and therefore was not in a position to expect the firm would withhold from its primary client any secrets obtained from the complaining client. See, e.g., *CAM v. E.B. Marks Music, Inc.*, 558 F.Supp. 57, 59 (S.D.N.Y.1983); *Waterbury Garment Corp. v. Strata Prods., Inc.*, 554 F.Supp. 63, 66 (S.D.N.Y.1982); *Premium Prods. Sales Corp. v. Chipwich*, 539 F.Supp. 427, 434 (S.D.N.Y.1982); *Cf. National Souvenir Ctr. v. Historic Figures, Inc.*, 728 F.2d 503, 517–18 (D.C.Cir.1984).

The facts of this case are closer to the *Allegaert* line of cases than the usual former client actions. In the latter type, the attorney has usually switched sides after representation of the former client has ended. In the *Allegaert* type of case, the former client typically hired the attorney with full knowledge of the attorney's con-

current representation of another client whose interests later became adverse to the former client. See *United States Football League v. National Football League*, 605 F.Supp. 1448, 1452 n. 7 (S.D.N.Y.1985). As the *Allegaert* Court explained:

> Integral to our conclusion that [the law firm] was not positioned to receive information intended to be withheld from [the law firm's current client] is the law firm['s] continuous and unbroken relationship with [its] primary client[ ]. In contrast with our earlier cases, the attorneys sought to be disqualified have not changed sides from a former client to a current, adverse client.... *Emle*, [*supra*], *Hull*, [*supra*], and *NCK*, [*supra*], do not control this disqualification motion because at all times [the law firm] represented the Perot interests. Any representation of Walston was done with Walston's knowledge that the firm was still representing the Perot interests and would continue to do so. [The law firm] never changed sides.

*Id.* at 251.

▮▮▮▮ Here Delta hired LeBoeuf to defend it in the Kentucky rehabilitation action at a time when Delta was aware that LeBoeuf was representing ASRIC against it in this action. Delta cannot hire its opponent's law firm and then disqualify the firm to protect confidences it may have imparted to the firm's attorneys. Moreover, according to Mr. Ryan (Delta's President until June 1985), at the time Delta hired LeBoeuf he did not believe Delta's and ASRIC's interests to be adverse and did not expect any secrets of Delta to be withheld from ASRIC. Ryan Aff. at ¶ 8. Given these considerations, I find the substantial relationship test and the Canon 4 former client doctrine inapplicable.

### C. *Canon 5 Issues*

A more vexing problem is presented by the fact that LeBoeuf is ostensibly suing its own client. Canon 5 provides that "[a] lawyer should exercise independent profes-

sional judgment on behalf of a client." [15] This Circuit has held that under Canon 5 concurrent "adverse representation is prima facie improper." *Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d 1384, 1387 (2d Cir.1976); see *Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 435 F.Supp. 84, 95–96, *modified,* 567 F.2d 225 (2d Cir.1977). In these situations, the attorney must show, "at the very least, that there will be no actual or *apparent* conflict in loyalties or diminution.in the vigor of his representation." *Cinema 5, supra,* at 1387. Moreover, such representation is permissible only with "the knowledge and consent of all concerned." *Id.* at 1386. See *Fund of Funds, supra,* at 96.

■■■ Delta is only a nominal party whose obligations have been assumed by DR. The liability, if established, falls on DR and National, and therefore, Delta could not be injured by LeBoeuf's dual representation. Moreover, according to Ryan's affidavit, Delta consented to representation by LeBoeuf with full knowledge of LeBoeuf's representation of ASRIC and under the belief that its interests were not adverse to ASRIC. Ryan Aff. at ¶ 8. Under these facts, I hold that LeBoeuf need not be disqualified under Canon 5 for suing its client.[16]

### D. *Need to Call LeBoeuf Attorneys as Witnesses*

DR 5–102(A) provides that if an attorney "learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client," he generally must disqualify himself. Defendants argue that because LeBoeuf attorneys Pine, Wright and Nilsen negotiated and acted as Delta Holdings' counsel during the preparation of the Stock Purchase and Bulk Reinsurance Agreements, they ought to be called to testify to the intent of the parties in drafting these contracts. This testimony, defendants argue, will be crucial at a trial because many of the claims asserted against DR and National in the amended complaint are based on these Agreements.

■■■ Defendants, however, have not shown that the LeBoeuf attorneys were intimately involved in the negotiation and drafting of the Agreements, although they may have been present at the negotiation sessions. ASRIC responds that Pine, Wright and Nilsen never participated in the negotiations or drafting of the Agreements. They were merely given drafts of the documents to review. See Wright Affidavit dated August 9, 1985 at ¶¶ 5–6.

There is no reason to believe that Pine, Wright or Nilsen will have to be called by ASRIC to testify to the negotiation of the Agreements. Defendants' motion to disqualify LeBoeuf under DR 5–102(A) is denied. See *Waterbury Garment Corp., supra,* 554 F.Supp. at 66; *Premium Prods. Sales Corp., supra,* 539 F.Supp. at 436.

### IV. *Conclusion*

Defendants' motion to dismiss for forum non conveniens is denied. Defendants' motion to disqualify plaintiff's counsel is denied.

SO ORDERED.

---

**15.** In addition, as to multiple representation generally, DR 5–105(C) also provides:

[A] lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent judgment on behalf of each.

**16.** Given these considerations, disqualification under Canon 9 because of any "appearance of impropriety" is similarly unwarranted. See *Armstrong v. McAlpin,* 625 F.2d 433, 446 (2d Cir.1980) ("absent a threat of taint to the trial, ... possible ethical [Canon 9 problems] are generally better addressed by the 'comprehensive disciplinary machinery' of the state and federal bar ... or possibly by legislation"); *Neiman, supra,* 512 F.Supp. at 190 n. 3.