AMERICAN SPECIAL RISK
INSURANCE COMPANY,
Plaintiff,

v.

DELTA AMERICA RE INSURANCE CO.,
DR Insurance Company, and National
Distillers and Chemical Corporation,
Defendants.

DR INSURANCE COMPANY,
Counterclaim Plaintiff,

v.

AMERICAN SPECIAL RISK INSUR-
ANCE COMPANY, Alexander & Alexan-
der of New York, Inc., Alexander How-
den Insurance Brokers, Ltd., and Atlan-
ta International Insurance Company,
Counterclaim Defendants.

Nos. 84 Civ. 1329(PNL),
85 Civ. 9860(PNL).

United States District Court,
S.D. New York.

Nov. 11, 1993.

Lord Day & Lord, Barrett Smith, New York City, Eugene F. Bannigan, John D. Gordan, III, Monica A. Derham, David Stoelting, of counsel, for plaintiff.

Breed, Abbott & Morgan, New York City, James D. Zirin, Alan J. Sorkowitz, Arthur C. Fahlbusch, Jr., of counsel, for defendants DR Ins. Co. and National Distillers and Chemical Corp.

## OPINION AND ORDER

LEVAL, District Judge.

Defendants DR Insurance Company ("DR") and National Distillers and Chemical Corporation ("National Distillers") move for summary judgment, contending that English law should govern this action and that, under English law, the contracts on which plaintiff American Special Risk Insurance Company ("ASRIC") sues are illegal and therefore unenforceable.

### Background

Unless otherwise noted, the following facts are not in dispute.

#### A. *The Underlying Insurance and Reinsurance Contracts*

Plaintiff ASRIC is an insurance company organized under Delaware law and having its principal place of business in Atlanta, Georgia. During 1979 and 1980, ASRIC issued product liability insurance policies for hundreds of companies throughout the United States and Canada that were members of eleven different trade associations in various businesses. These policies were part of the "Associations Program," an approach to insuring the product liability risks of trade association members that was designed by counterclaim defendant Alexander & Alexander Inc. ("A & A"), an insurance broker incorporated in Maryland with its principal place of business in New York.

ASRIC sought to "cede" its risk under these policies to a reinsurer. "Reinsurance occurs when one insurer (the 'ceding insurer' or 'reinsured') 'cedes' all or part of the risk it underwrites, pursuant to a policy or group of policies, to another insurer. The reinsurer agrees to indemnify the ceding insurer on the risk transferred." *Unigard Security Insurance Co. v. North River Insurance Co.*, 4 F.3d 1049, 1053 (2d Cir.1993), (citations omitted). "Under American insurance law, an insurer can write insurance only up to a certain amount determined by its assets. However, if the insurer obtains reinsurance whereby its risk in the direct insurance is insured by another company, the direct insurer may be able to obtain reinsurance credit permitting the insurer to take on additional risk coverage." *American Special Risk Insurance Co. v. Delta American Re Insurance Co.*, 634 F.Supp. 112, 114 (S.D.N.Y.1986) (Leval, J.).

ASRIC retained counterclaim defendant Alexander Howden Insurance Brokers Ltd., an English company headquartered in London, to arrange reinsurance;[1] Howden in turn used the services of a specialized reinsurance broker, Charman Mauduit Insurance Brokers Ltd., another English company headquartered in London. Alexander Howden and Charman Mauduit arranged for ASRIC to reinsure most of the 1979–80 Associations Program risk with defendant Elkhorn Insurance Co., now known as Delta American Re Insurance Co. ("Elkhorn/Delta" or "Delta"). Elkhorn/Delta was and is a company organized under Kentucky law. From 1979 until approximately 1985, it had its principal place of business in New York; it is now in

---

1. In fact, ASRIC, then known as Cranford Insur- ance Co., was a subsidiary of Alexander Howden.

liquidation.[2]  Until 1983, Elkhorn was owned by defendant National Distillers (now known as Quantum Chemical Corporation), a Virginia corporation with its principal place of business in New York.

Elkhorn/Delta was a member of a reinsurance syndicate in London managed by Stetzel Thomson & Co. Ltd. ("Stetzel"), an English company headquartered in London. "Each member of the syndicate signed an Agency Agreement under which Stetzel had authority to reserve reinsurance business, collect premiums, and distribute accounts for each syndicate member.  Each member would ordinarily be liable for a percentage of the total risk of the syndicate." *American Special Risk Insurance Co. v. Delta American Re Insurance Co.*, 634 F.Supp. at 114.[3]

During 1979–80, Stetzel, acting as agent for this non-marine reinsurance syndicate, accepted reinsurance coverage of ASRIC. Elkhorn/Delta was one of twenty-two members of this syndicate and the only member incorporated in the United States.  The other members were located primarily in Europe, Latin America, and Bermuda.  The agreement between Stetzel and the syndicate members allowed Stetzel to reserve particular risks for the syndicate members generally, or to reserve reinsurance business for the syndicate in the name of a single syndicate member.  According to ASRIC, because Elkhorn/Delta was the only member incorporated in the United States, Stetzel designated Elkhorn/Delta as the "fronting" company for the syndicate.  This meant that Elkhorn/Delta would be liable for 100% of the syndicate's total liability, with a right of indemnification against the other syndicate members for their designated shares of the syndicate's total liability.

Under the law of Delaware, ASRIC's state of incorporation, an insurer will receive reinsurance credit only if the reinsurer is licensed to transact insurance in Delaware or in another state with comparable standards of insolvency for insurance companies.  "If the reinsurer is an unincorporated alien insurer, the reinsured can obtain reinsurance credit only if the reinsurer establishes a trust fund here for the benefit of the reinsured." *American Special Risk Insurance Co. v. Delta American Re Insurance Co.*, 634 F.Supp. at 114.  Because most states have comparable standards, the fronting arrangement allowed ASRIC to obtain a reinsurance credit for all the risks ceded to Elkhorn/Delta, without the other members of the syndicate having to post security in the United States.

Elkhorn/Delta was never licensed to engage in the business of insurance or reinsurance in London.[4]

In arranging this reinsurance, ASRIC did not deal directly with Elkhorn/Delta or any other members of the syndicate.  Following consultations with ASRIC in Georgia and A & A in New York, Charman Mauduit would submit to Stetzel in London a "slip," which was a written proposal summarizing the terms and conditions of each proposed reinsurance of ASRIC by Elkhorn/Delta.  A Stetzel employee would approve the reinsurance, indicating his agreement with a rubber stamp on the slip that indicated it had been

---

2.  Delta's business is now conducted from the offices of the Kentucky Department of Insurance. *See Stephens v. National Distillers and Chemical Corp.*, 6 F.3d 63 (2d Cir.1993).

   The action against Delta has been stayed.

3.  Charman Mauduit's activities on behalf of ASRIC were not governed by a written agreement, but Stetzel and Elkhorn/Delta did have such. Their agreement, stated, *inter alia*, that,

   It is understood that the business accepted by [Elkhorn/Delta] hereunder is to be subject to English law and usage as to liability for and settlement of any and all claims unless specifically provided to the contrary in the individual Contracts signed by [Elkhorn/Delta].
   Sorkowitz Aff., Exh. 3 to Exh. E, Art. 12.

4.  According to DR and National Distillers, Elkhorn/Delta agreed to participate in the reinsurance syndicate on the condition that a further layer of reinsurance be arranged.  Alexander Howden and Charman Mauduit arranged for approximately 75–80% of the risks to be re-reinsured by (or "retroceded to") several companies, including Ajax Insurance Company, a Bermuda company with its principal place of business in Hamilton, Bermuda, and Beacon Insurance Company, a North Carolina company with its principal place of business in Dallas, Texas. Both these companies were represented by B.F.G. Toomey Associates Ltd., an English company headquartered in London.  Ajax and Beacon were not licensed to engaged in the business of insurance or reinsurance in England.

reserved for the syndicate fronted by Elkhorn/Delta.[5] In at least some cases, Charman Mauduit would then draft a formal reinsurance policy and submit it to Stetzel for approval by syndicate members. Stetzel would then seek acceptance of the reinsurance by the members, including Elkhorn/Delta in New York. The members would each initial or sign the acknowledgment forms and return them to Stetzel in London. Once Stetzel had received acknowledgment forms pertaining to a risk from all syndicate members, it would deliver a copy of the provisional bordereau to Charman Mauduit, the reinsurance intermediary, confirming that the risk had been bound by the syndicate members. A copy of the policy would then be sent on to ASRIC in Atlanta.[6]

According to ASRIC, in the case of four of the eleven trade associations risks, reinsurance policies between ASRIC and Elkhorn/Delta were prepared in London by Charman Mauduit and Stetzel in London and signed by Elkhorn/Delta, as the sole reinsurer, by its president in New York.

Under this arrangement, the original insureds paid their premiums and reported their claims to A & A, which referred all the claims to its New York law firm. Stetzel collected premiums on the reinsurance contracts from ASRIC and submitted claims to

syndicate members, including Elkhorn/Delta, for approval and payment.

## B. *Purchase of Elkhorn/Delta and Assumption of its Liabilities*

In September 1983, before this action was instituted, Elkhorn was sold by its owner, National Distillers, to Delta Holdings, Inc. ("Delta Holdings") pursuant to a Stock Purchase Agreement. After the sale, Elkhorn's name was changed to "Delta Re Insurance Co." Under the terms of this Agreement, Elkhorn's reinsurance liabilities placed by Stetzel, including those at issue here, were not transferred to Delta Holdings. Instead, National agreed to form a captive subsidiary company, DR, that would assume, *inter alia*, these reinsurance obligations. National Distillers also agreed to capitalize DR with sufficient funds to cover the expected losses from the assumed reinsurance liabilities.[7] This Agreement was signed in New York by Delta Holdings, National Distillers, and Elkhorn. Section 17 of the Agreement provided that, "This Agreement shall be governed in all respects including validity, interpretation and effect by the laws of the State of New York."

At the same time, Elkhorn, Delta Holdings, and DR entered into an Agreement of Bulk Reinsurance, in which DR agreed to assume, *inter alia*, all of Elkhorn's reinsurance obligations written through Stetzel.[8]

---

5. Apparently, Stetzel would reserve reinsurance by stamping the slip "Reserved for Stetzel, Thomson Non Marine Syndicate" with the initials "NB," which, according to ASRIC, signified Elkhorn/Delta.

6. According to National Distillers and DR, the re-reinsurance, or retrocession, transactions were carried out in a similar fashion: slips were executed and the policies were delivered in London.

7. Section 10 of the Stock Purchase Agreement provided, in pertinent part:

(a) [National Distillers] undertakes to cause Elkhorn to form a wholly-owned insurance subsidiary (the "National Captive") having an initial capital of between $5,000,000 and $6,000,000.... The National Captive shall assume: ...

(ii) the commitments relating to Stetzel Thomson & Co. Ltd......

In connection with these commitments, the National Captive shall, and [National Distillers] undertakes to cause the National Captive to enter into an agreement of Asset Transfer

and Assumption of Liabilities in form and substance satisfactory to [Delta] which shall provide for the transfer by Elkhorn to the National Captive of assets with a book value as shown in financial statements of Elkhorn equal to the liabilities assumed pursuant to [various subsections, including (ii)].....

Stock Purchase Agreement ¶ 10(a). The Agreement further provides that Elkhorn would transfer the stock of National Captive to National Distillers as a dividend prior to the date of closing.

Presumably, DR is the same entity as National Captive, although the Amended Complaint and the parties' submissions do not make this clear.

8. The Agreement of Bulk Reinsurance provided, in pertinent part:

1. Elkhorn herewith, effective September 30, 1983, conveys, assigns, transfers and sets over to DR all of Elkhorn's right, title and interest in and to all insurance and reinsurance commitments of Elkhorn pertaining to the following: ...

(b) all commitments of Elkhorn placed by or through Stetzel Thomson & Co. Ltd.....

Section 7 of this Agreement provided that, "This Agreement shall be governed by and construed under the laws of the State of New York."[9] According to this agreement, DR is a Kentucky corporation; ASRIC asserts, and defendants do not deny, that DR has its principal place of business in New York.

After these transactions, Elkhorn, its name now changed to Delta, was a subsidiary of Delta Holdings, and its former parent, National Distillers, had agreed to assume Elkhorn's reinsurance commitments with respect to ASRIC through a new subsidiary, DR. ASRIC was a bystander to these transactions; it was not involved in the sale of Elkhorn, and it did not approve the transfer of Elkhorn's obligations to National Distillers. *See American Special Risk Insurance Co. v. Delta America Re Insurance Co.*, 84 Civ. 1329 (PNL), slip op. at 6 (S.D.N.Y., October 19, 1988).

## C. Earlier Proceedings

In February 1984, ASRIC commenced this action against Delta for amounts allegedly due and unpaid under the reinsurance contracts. According to ASRIC, Delta failed to pay at least $3,310,000 for losses and expenses paid by ASRIC on the policies reinsured. Delta moved to dismiss the action on the grounds of *forum non conveniens*. While that motion was pending, Delta was placed in rehabilitation by the Kentucky Insurance Commissioner because of concern over its solvency. ASRIC filed an amended complaint in June 1985 against DR and National as well as Delta. The first cause of action, for breach of contract against DR, asserts that DR's assumption of the reinsurance contracts placed by ASRIC with Elkhorn makes DR primarily liable for payment of the claims arising out of these contracts. The second cause of action, for breach of contract against Delta, asserts that Delta continues to be responsible for the commit-

ments made by Elkhorn, notwithstanding the assumption of these commitments by DR pursuant to the Stock Purchase Agreement and the Agreement of Bulk Reinsurance, and seeks relief from Delta in the event DR fails or is unable to pay its obligations to ASRIC. The third cause of action, for tortious interference with contractual relations against National Distillers, contends that National Distillers tortiously impaired ASRIC's contracts with Elkhorn by transferring Elkhorn's liabilities to a subsidiary, DR, that was undercapitalized, and by selling Elkhorn on terms that left Elkhorn (now Delta) financially unable to fulfill its continuing obligations. This cause of action alleges that although National Distillers expressly recognized Elkhorn's reinsurance commitments to ASRIC in the Stock Purchase Agreement and in the Agreement of Bulk Reinsurance (signed by National Distillers's subsidiary, DR), National Distillers nonetheless failed to provide DR with funds adequate to meet its obligations. Finally, the fourth cause of action, for breach of contract against National Distillers, asserts that ASRIC is a third party beneficiary to the Stock Purchase Agreement and the Agreement of Bulk Reinsurance and therefore entitled to enforce those provisions in the agreements providing that sufficient assets would be transferred to DR for it to cover the liabilities on the Stetzel reinsurance policies.

On March 31, 1986, I denied defendants' motion to dismiss based on the doctrine of *forum non conveniens*. I concluded that there was no adequate ground for denying plaintiff its choice of forum, especially in light of the claims against DR and National Distillers arising out of a contract negotiated and signed in the United States. *American Special Risk Insurance Co. v. Delta America Re Insurance Co.*, 634 F.Supp. 112, 119 (S.D.N.Y.1986).

---

2. DR hereby assumes, effective September 30, 1983, all of the liabilities of Elkhorn with respect to the insurance and reinsurance commitments referred to in Section 1(a), (b) and (c) above . . .
Agreement of Bulk Reinsurance ¶¶ 1–2.

9. Under the law of Kentucky (Elkhorn/Delta's state of incorporation), Kentucky's Commission-

er of Insurance was required to approve both the Stock Purchase Agreement and the Agreement of Bulk Reinsurance. In October 1983, the Commissioner approved these transactions, indicting that he had found that the Agreement of Bulk Reinsurance protected Elkhorn/Delta's policyholders. *See* Ky.Rev.Stat. §§ 304.24–410(4)(C), 304.24–420(2).

Shortly thereafter, DR filed its Amended Answer to the Amended Complaint, asserting counterclaims, based on common law fraud, breach of duty, and violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), against ASRIC, A & A, Alexander Howden, and others, alleging that the counterclaim defendants had entered into a scheme to defraud various reinsurers, including Elkhorn/Delta, by misrepresenting the risks being insured. In their reply, A & A, Alexander Howden, and others interpose third party claims against DR, National Distillers, and Delta identical to those asserted by ASRIC in the Amended Complaint.

National Distillers moved to dismiss the third and fourth causes of action against it. At the same time, ASRIC and the additional defendants moved to dismiss the counterclaims on *forum non conveniens* grounds, contending that the counterclaims changed the fundamental nature of the action to one that should be conveniently litigated in England. In a Memorandum and Order dated October 19, 1988, I denied National Distillers's motion to dismiss, concluding that the Amended Complaint adequately stated claims for tortious interference with contract and for breach of contract. I also denied the counterclaim defendants' *forum non conveniens* motion, for reasons essentially similar to those in my earlier opinion.

Apparently in light of recent developments in English case law, DR and National Distillers now move for summary judgment.

### Discussion

DR and National Distillers contend that this court, applying New York choice of law rules, should apply English law to ASRIC's claims and that, under English law, the reinsurance contracts upon which ASRIC sues are unenforceable because they were entered into by Elkhorn/Delta, a company not licensed to engage in the business of insurance or reinsurance in England. (That is, DR and National Distillers are claiming that they should not be held liable for claims against Elkhorn/Delta because Elkhorn/Delta's own illegal act of engaging in reinsurance in England without a license makes any reinsurance contracts void and unenforceable under En-

glish law.) ASRIC responds that New York law should govern this action, that the reinsurance contracts are valid and enforceable under New York law, that this court should decline to apply English law on public policy grounds, and that, even if English law is applicable, the reinsurance contracts are not void under English law.

### A. Contractual Choice of Law Provisions

The parties to this motion all point to contractual choice of law provisions that they contend govern this action and resolve the motion. Such a provision, if applicable, might well determine the governing law, for New York courts generally give great deference to a contract's designation of the law that is to govern disputes arising from the contract "if the state whose law is thus selected has sufficient contacts with the transaction." *Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivianos*, 756 F.Supp. 136, 139 (S.D.N.Y.1991) (citations omitted); *see Culbert v. Rols Capital Co.*, 184 A.D.2d 612, 585 N.Y.S.2d 67, 68 (2d Dept.1992) (citing *Freedman v. Chemical Constr. Corp.*, 43 N.Y.2d 260, 265, 401 N.Y.S.2d 176, 372 N.E.2d 12 (1977)); *North American Bank, Ltd. v. Schulman*, 123 Misc.2d 516, 474 N.Y.S.2d 383, 385 (Westchester Cty. Ct. 1984); *see also Zerman v. Ball*, 735 F.2d 15, 20 (2d Cir.1984); *Launois v. Midland–Ross Corp.*, 751 F.Supp. 452, 454 (S.D.N.Y.1990), *aff'd mem.*, 935 F.2d 1277 (2d Cir.1991). Such provisions may be dishonored "where the jurisdiction whose law is to be applied has no reasonable relation to the agreement or where the enforcement of the provision would violate a fundamental public policy." *Culbert v. Rols Capital Co.*, 184 A.D.2d 612, 585 N.Y.S.2d 67, 68 (2d Dept.1992) (citations omitted); *accord Gambar Enterprises, Inc. v. Kelly Services, Inc.*, 69 A.D.2d 297, 303, 418 N.Y.S.2d 818 (4th Dept.1979); *see generally Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 52 (2d Cir.1984).

DR and National Distillers look to the provision in the agreement between Stetzel and Elkhorn/Delta that provided that reinsurance policies arranged by Stetzel on behalf of Elkhorn/Delta would be governed by English law. In contrast, ASRIC points out

that the Stock Purchase Agreement and the Agreement of Bulk Reinsurance each provided that they would be governed by New York law. As ASRIC claims to be a third party beneficiary of both agreements, and as at least two of ASRIC's four causes of action relate to these agreements, ASRIC contends that New York law should govern this action.

█ I do not believe that the choice of British law provisions in the Stetzel–Elkhorn agreement is appropriately applied here. First, ASRIC was not a party to the Stetzel–Elkhorn agreement. On the contrary, it is the co-defendants of Elkhorn/Delta (which *was* a party to the agreement) that seek to enforce the choice of law provision against ASRIC. In such a situation, it makes no sense that ASRIC should be bound by a choice of law agreement between Elkhorn/Delta and its London insurance agent.

█ ASRIC's attempt to apply the New York choice of law provisions of the 1983 agreements is more persuasive, at least as to the causes of action premised on the Stock Purchase and Bulk Reinsurance Agreements. The parties to those agreements agreed that disputes arising under them would be governed by New York law. And, the second and third causes of action in ASRIC's Amended Complaint are at least in part predicated on promises of DR, Delta, and National Distillers in the Stock Purchase Agreement and the Agreement of Bulk Reinsurance, of which ASRIC claims to be a beneficiary.

However, the underlying basis for each of ASRIC's causes of action is the liability of Elkhorn to ASRIC on the reinsurance policies themselves. There is no apparent reason to apply the choice of law provisions of those later agreements to ascertain the relevant law for determining Elkhorn/Delta's liability to ASRIC under the earlier reinsurance policies.

B. *New York Choice of Law Rules as Applied to the Elkhorn Reinsurance Policies*

█ A federal court, sitting in diversity, applies the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec.*

*Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *see Arkwright–Boston Mfrs. Mut. Ins. Co. v. Calvert Fire Ins. Co.,* 887 F.2d 437, 439 (2d Cir.1989).

New York courts generally apply the law of the jurisdiction having the "greatest concern with the specific issue raised in the litigation." *Babcock v. Jackson,* 12 N.Y.2d 473, 481, 240 N.Y.S.2d 743, 749, 191 N.E.2d 279, 283 (1963). "In contract cases, New York courts use a 'center of gravity' or 'grouping of contacts' analysis, and apply '"'the law of the jurisdiction having the greatest interest in the litigation.'"'" *Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivianos,* 756 F.Supp. 136, 140 (S.D.N.Y.1991) (citations omitted); *accord Jefferson Ins. Co. v. Fortress Re, Inc.,* 616 F.Supp. 874, 877 (S.D.N.Y.1984) ("New York applies a 'contacts' analysis, applying the law of the state with the greatest interest in the litigation.") (citing cases); *see also Hutner v. Greene,* 734 F.2d 896, 899 (2d Cir.1984) (quoting *Intercontinental Planning, Ltd. v. Daystrom, Inc.,* 24 N.Y.2d 372, 383, 300 N.Y.S.2d 817, 825, 248 N.E.2d 576, 581 (1969)) ("New York courts apply a 'paramount interest' test to choice of law issues involving contractual disputes. Under such a test, the 'law of the jurisdiction having the greatest interest in the litigation will be applied and ... the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict.'"); *see generally J. Zeevi & Sons, Ltd. v. Grindlays Bank (Uganda) Ltd.,* 37 N.Y.2d 220, 226–27, 371 N.Y.S.2d 892, 898, 333 N.E.2d 168, 172 (1975) ("'"[T]he rule which has evolved clearly in our most recent decisions is that the law of the jurisdiction having the greatest interest in the litigation will be applied and that the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict."'") (citation omitted); *cf. Schultz v. Boy Scouts of America, Inc.,* 65 N.Y.2d 189, 197, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985) ("'the law of the jurisdiction having the greatest interest in the litigation will be applied'") (tort action).

■ DR and National Distillers contend that English law should govern because that is where the reinsurance contracts at issue were made. For several reasons, this is unpersuasive. First, although New York's choice of law rules consider the place where a contract was made, the traditional rule of *lex loci* "has been replaced by interest analysis, which ' "gives to the place 'having the most interest in the problem' paramount control over the legal issues arising out of a particular factual context, thus allowing the forum to apply the policy of the jurisdiction "most intimately concerned with the outcome of [the] particular litigation." ' " *Keoseian v. von Kaulbach*, 763 F.Supp. 1253, 1255–56 (S.D.N.Y.1991) (quoting *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 382, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969) (quoting *Auten v. Auten*, 308 N.Y. 155, 161, 124 N.E.2d 99 (1954))), *aff'd mem.*, 956 F.2d 1160 (2d Cir.1992). The place where the contract is made, then, is but one consideration under New York's contacts analysis.

Second, as the above narrative makes clear, it is not so easy to say where the contracts at issue here were "made." Both ASRIC and Elkhorn were represented in the arrangement of reinsurance by insurance brokers in London. Although the procedures of the London reinsurance market are such that the reinsurance deals were arranged there, the actual reinsurance contracts were made in pieces; Elkhorn/Delta, the reinsurer, signed on to the policies in its offices in New York (either by signing the acknowledgment forms or, in some cases, by signing the signature page of the formal policies). I therefore do not believe this is a simple case of two parties coming together in London and signing a single contract. *Cf. Swing v. Dayton*, 124 A.D. 58, 108 N.Y.S. 155 (3d Dept.1908).

■ Applying New York's contacts analysis to this set of complex facts, I conclude that a New York court would apply New York law to the claims in ASRIC's Amended Complaint. The relationship of New York to this reinsurance litigation is at least as significant as its relationship to any other jurisdiction. Almost every party to this action, including the counterclaim defendants, is an American corporation. Indeed, the two moving defendants, DR and National Distillers both have their principal place of business in New York. The central contractual dispute involves an American insurance company based in Georgia that insured North American risks[10] through an insurance program set up by an insurance broker based in New York and then obtained reinsurance for these risks with an American company based in New York. *See Monarch Insurance Co. v. Insurance Corp. of Ireland Ltd.*, 835 F.2d 32, 35–36 (2d Cir.1987) (applying New York law). The reinsurance scheme set up by these policies also had significant contacts with New York. ASRIC would refer claims on the risks it insured to a New York law firm, which would submit claims on the reinsurance policies to Stetzel in London. After processing the claims, Stetzel would submit them to syndicate members, including Elkhorn/Delta in New York, for approval and payment. In addition, as I suggested in my 1986 decision, New York has an interest in assuring that fronting companies licensed to do business in the state, and companies such as DR and National Distillers, with their principal places of business in New York, pay their debts. *American Special Risk Ins. Co. v. Delta American Re Insurance Co.*, 634 F.Supp. at 119; *see also Kristinus v. H. Stern Com. E Ind. S.A.*, 463 F.Supp. 1263, 1265 (S.D.N.Y.1979); *Travelers Ins. Co. v. Buffalo Reinsurance Co.*, 735 F.Supp. 492, 498 (S.D.N.Y.), *vacated on rearg. on different grounds*, 739 F.Supp. 209 (S.D.N.Y.1990). These considerations convince me that New York has the "paramount interest" in applying its law to the claims in the Amended Complaint.[11]

10. DR and National Distillers suggest that the location of the risks is not a relevant consideration with respect to contracts of reinsurance, but *Jefferson Ins. Co. v. Fortress Re, Inc.*, 616 F.Supp. 874, 877 (S.D.N.Y.1984), upon which they rely, simply observed that New York's interest in protecting its insureds is "more attenuated when the suit is premised solely on the reinsurance contract," not that this interest is nonexistent. It is one of many considerations.

11. Of course, my decision on this issue does not necessarily determine the law applicable to the claims against the counterclaim defendants. *See*

DR and National Distillers point to several other factors, which I have considered, but which do not convince me that New York law is not appropriately applied to the reinsurance contracts at issue here. Defendants emphasize the interest of England in regulating the business of insurance and reinsurance. A review of the English decisions submitted to the court on this motion, however, makes clear that any interest England has in making insurance and reinsurance contracts entered into by unlicensed companies unenforceable is minimal at best. Although the Insurance Companies Acts of 1974 and 1981 (consolidated in the Insurance Companies Act of 1982) have been interpreted by at least the lower courts of England as making a contract entered into by an unlicensed insurance company unenforceable (in fact, these acts make it a criminal act for an unlicensed company to enter into such a contract), Parliament amended the relevant law in 1986 so that such an insurance contract made by an unlicensed company will still be enforceable, at least *against* that party. Financial Services Act of 1986 § 132. Although the English courts have interpreted this change in the law as not applying retroactively to the period during which unlicensed Elkhorn/Delta entered into the reinsurance contracts at issue here, Parliament's change of the law certainly suggests that England's interest in making *all* such contracts void and unenforceable is hardly significant.

Defendants also contend that English law should be applied to ASRIC's claims because otherwise "substantial injustice" would result. One of the English decisions upon which defendants rely, *DR Insurance Co. v. Seguros America Banamex* (July 30, 1992) (unpublished), held that Elkhorn/Delta's agreements with the other members of the Stetzel reinsurance syndicate were void, based on the fact that Elkhorn/Delta was not licensed to engage in insurance in England at the time it entered into those contracts. Ac-

cordingly, DR has lost its indemnification rights against other syndicate members, and so may be "whipsawed" if it is found liable in this litigation for Elkhorn/Delta's commitments. Although such a result might be unfortunate for DR, it would be entirely attributable to the actions of Elkhorn/Delta, DR's predecessor in interest, in engaging in insurance in England without a license.[12] I do not believe this is a justification for not applying New York law to ASRIC's claims.

Because of my conclusion that New York law should govern, I need not reach an additional argument supporting ASRIC's position. ASRIC contends that enforcement of the British rule denying ASRIC the benefit of its contracts with Elkhorn by reason of Elkhorn's failure to secure licensing in the United Kingdom is contrary to the public policy of New York. There is substantial justification for ASRIC's argument. If the United Kingdom seeks to prevent unlicensed entities from writing insurance in the U.K., it makes little sense and arguably offends fundamental fairness to grant these unlicensed entities windfall profits by denying their insureds the right to enforce their contracts of insurance. This punishes the insureds and rewards the insurer for the wrongdoing of the insurer. It is not surprising that this rule was legislatively overturned.

*Conclusion*

For the reasons above, I conclude that New York law is appropriately applied to ASRIC's claims in the Amended Complaint. Accordingly, DR and National Distillers' motion for summary judgment based on the application of English law to these claims is denied.

SO ORDERED.

*Hutner v. Greene*, 734 F.2d 896, 901 (2d Cir. 1984) (discussing the doctrine of depacage, under which " 'the rules of one legal system are applied to regulate certain issues arising from a given transaction or occurrence, while those of another system regulate the other issues' ") (citation omitted).

12. In addition, the recent *DR Insurance Co. v. Seguros America Banamex* case was rendered by an English trial court. The parties submissions do not make clear whether that court's judgment might be reversed on appeal.