OPINION OF THE COURT
Diane A. Lebedeff, J.
In these two cases involving reinsurance policies, motions for summary judgment seek a determination regarding the parties’ rights under reinsurance arrangements made through the Society of Lloyd’s of London (Lloyd’s). In each case, the court must decide whether the defendant’s predecessor was a "fronter” for a reinsurance syndicate, which would render defendant wholly responsible for the payment of the claims in the same manner as if it were the sole reinsurer and, if defendant is wholly responsible, whether the reinsurance arrangements are void and unenforceable under English law in the event that English law is applicable. The motions are consolidated solely for the purpose of this decision.
Before embarking on the contradictory and complex paths laid out by able counsel which wend through issues involving Lloyd’s practices, possible international conflict of laws, and other murky but inviting areas, the court has found consistent comfort in the concept that reinsurance is insurance between consenting adults.

Background and Facts

In both actions, the defendant is DR Insurance Company *210 (DR), the current successor of Elkhorn Re Insurance Co. (Elkhorn), and the plaintiff is the Superintendent of Insurance, suing as liquidator of the original reinsureds. In the first case, involving a marine reinsurance policy issued to American Fidelity Fire Insurance Company and American Consumer Insurance Company (the marine policy), plaintiff requests $980,114.93. In the second case, involving five reinsurance aviation policies issued to Ideal Mutual Insurance Co. (Ideal), plaintiff seeks $766,558.03. Both amounts are exclusive of interest and are based upon the claim that defendant must pay all amounts due from the syndicate.
Elkhorn was an insurance and reinsurance company incorporated in Kentucky with offices in New York. In the early 1970’s, Elkhorn became interested in the London reinsurance market conducted by Lloyd’s. In this connection, Elkhorn sought the services of Stetzel, Thompson & Co. (Stetzel Thompson), an English broker and member of Lloyd’s which acted as an underwriter in seeking reinsurance opportunities for Elkhorn. Reinsurers are often international reinsurance syndicates composed of a dozen or so companies, so Elkhorn joined several Stetzel Thompson reinsurer syndicates.
In relation to all these arrangements, plaintiff contends that Elkhorn was a "fronter,” and, in that role, Elkhorn’s successor is required to pay all claims of the reinsureds "up front” and then recover payments made above and beyond Elkhorn’s share of the syndicate from the other syndicate members. The word "fronter” does not appear in the underlying documents, but the role comes into play by following a procedure understood in the English reinsurance industry. Defendant concedes it is responsible for a percentage share of the claims equal to its percentage participation in the relevant syndicate and argues that it has no larger responsibility.
Generally, as happened here, a broker in London presents a proposal for reinsurance on behalf of its clients to an underwriter at Lloyd’s. The broker identifies the key points of the desired reinsurance sought on a card called a "placing slip.” Such a slip briefly identifies the reinsured, the details of the risk, and a few other essential terms. Underwriters who desire to participate in the reinsurance write a percentage of the total risk which they might assume, initial the slip, and affix a stamp. The placing slip is essentially the contract arrangement until an actual policy, called a "wording,” is prepared. Policy preparation is often done at Lloyd’s signing office and quite frequently occurs several years later.
*211 Stetzel Thompson, Elkhorn’s underwriter, participated in this placing slip procedure. In some instances, it would add to its stamp a syndicate name and then a two letter code utilized to refer to Elkhorn, which plaintiff claims obligated Elkhorn as a "fronter.” Stetzel Thompson would advise the syndicate members of the general details of each particular reinsurance arrangement, using a distinct notification and approval procedure for any "fronter,” and, eventually, the reinsurance contract would follow.
The marine policy placing slip was signed by Stetzel Thompson on December 1, 1980, and the final policy was signed by Elkhorn on May 21, 1983. The aviation policies sprang from placing slips signed between October 1, 1979 and April 1, 1981, with all the contracts signed in November of 1983. The pattern follows the process of Lloyd’s contract formation as described in Sumitomo Mar. & Fire Ins. Co. v Cologne Reins. Co. (75 NY2d 295 [1990]).
The participants did not fare well thereafter. Elkhorn’s corporate ownership changed several times, at least once in a less than seemly fashion (see, Delta Holdings v National Distillers & Chem. Corp., SD NY 1990, Keenan, J.). Once, in 1985, Elkhorn was placed in liquidation in Kentucky. As described in American Special Risk Ins. Co. v Delta Am. Re Ins. Co. (634 F Supp 112 [SD NY 1986, Leval, J.]), which involved a similar reinsurance arrangement, DR, as Elkhorn’s successor, was deemed a holding company for identified disputes such as these. The three reinsureds involved in the two cases before this court are in liquidation, which is the reason any arbitration clause has not been brought into play (see, Corcoran v Ardra Ins. Co., 77 NY2d 225 [1990]). Stetzel Thompson, the English representative of Elkhorn for reinsurance syndication purposes, is under bankruptcy protection, which the court assumes is a rare event given the solvency requirements in the British insurance industry.
To avoid the linguistic complications that would otherwise arise, this decision will use the term "reinsurance arrangement” when referring to events prior to physical issuance of a reinsurance policy and the term "policy” rather than treaty when referring to the final reinsurance document.

The Marine Reinsurance

Because of the plethora of issues to be examined in relation to the marine policy, the obvious must be stressed at *212 the outset. The marine policy was issued solely in the name of Elkhorn, was signed by Elkhorn in New York City, and names as the reinsureds two insurance companies domiciled in New York State. The insurance portfolio reinsured was American. The policy requires arbitration in New York before the American Arbitration Association. As a result, the court concludes that the marine policy is a New York policy to be enforced consistent with its terms in the same manner as any New York insurance policy.
Elkhorn’s name on the policy as reinsurer is entirely consistent with Elkhorn’s position as a fronter. The marine syndicate documents and the process followed by Elkhorn’s underwriter lead to the inescapable conclusion that Elkhorn was a fronter and was so bound shortly after the commencement of this reinsurance arrangement. Elkhorn authorized Stetzel Thompson to "reserve business” in its name by article 3 of the syndicate agreement. All syndicate members agreed that "surplus liability” above a syndicate member’s percentage participation (designated share) would be reapportioned among the other syndicate members, thus rendering them reinsurers for any fronter. Article 7 of the agreement, entitled "Bordereaux,” requires that syndicate members be advised of offers to reinsure and an acknowledgment of such offers made within 10 days of receipt. An affidavit of an Elkhorn officer states that if Elkhorn were a fronter, it would receive a slip termed a bordereaux or provisional bordereaux with Elkhorn’s name in the box headed "retrocession of.” Typically, if Elkhorn were a fronter, Elkhorn would later receive a signing schedule, which is a signature page. Where, as here, Elkhorn’s name appears in the retrocession box and the policy names Elkhorn rather than the syndicate as the reinsurer, an argument that Elkhorn was not the fronter is insupportable.
Accordingly, both the New York insurance policy and the combination of Lloyd’s and Stetzel Thompson practices lead to the same conclusion. While Elkhorn’s successor may pursue its reinsurance rights against other syndicate members because those members stood as Elkhorn’s reinsurers, Elkhorn’s successor must be held to be entirely liable on this policy. This record is sufficient for summary judgment (see, Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395, 404 [1957]).
Defendant’s single exculpatory argument urges that the Lloyd’s marine arrangement was void because Elkhorn was not authorized to carry on insurance business in the United Kingdom. To the extent that this court and counsel can *213 determine, this particular issue has not previously been posed to a court in the United States. There is no short description of this impediment, which arises out of the system of insurance company regulation utilized in the United Kingdom. To set a broad perspective, the current regulatory scheme was addressed — in the context of a forum non conveniens determination — in In re Insurance Antitrust Litig. (723 F Supp 464, 487-488 [ND Cal 1989], revd and remanded 938 F2d 919 [9th Cir 1991]), as follows: “The London reinsurance and retrocessional reinsurance business, the subject of these claims, takes place in a regulatory and competitive framework established by the British government. In 1870, Parliament, by the Lloyd’s Act, established the Society of Lloyd’s and empowered it to regulate the marketplace composed of its members. The Lloyd’s governing body continues to be empowered to exercise quasi-governmental authority in regulating the activities of its members. Lloyd’s Acts, 1870-1982. The London Company Market companies are incorporated in the United Kingdom in accordance with the Companies Act, 1985, are regulated by the Insurance Companies Act, 1982, and associated regulations, and are supervised by the British Department of Trade and Industry. Agreements among British insurers, reinsurers, and retrocessional reinsurers (including both Lloyd’s and London Company Market underwriters) relating to the provision of insurance services are expressly exempted from British regulation of anti-competitive agreements. See Restrictive Trade Practices (Services) Order 1976, S.I. 1976 No. 98, Schedule |f 8.” At issue here is the requirement of British authorization of an insurer which, "in one form or another go back to the Life Assurance Companies Act of 1870” (Re Cavalier Ins. Co., [1989] 2 Lloyd’s Rep 430 [Knox, J.]).
The issue first arose under section 2 of the Insurance Companies Act of 1982 (the 1982 Act), which prohibits unauthorized insurers from “carrying] on any insurance business” in the United Kingdom for specified classes of insurance. Starting with determinations commencing in 1984, this prohibition has led to a slender but fairly uniform line of decisions holding the resulting insurance arrangements and policies unenforceable if the point was raised by a party, although the prohibition was not so strong that a court was required, sua sponte, to invalidate all insurance obligations undertaken by an unauthorized insurer. Because many insureds and reinsureds were placed at risk by this result, which was viewed as surprising by Lloyd’s and the public, general criticism arose. *214 Shortly thereafter, section 132 of the Financial Services Act of 1986 was enacted permitting discretionary judicial enforcement of such a contract, although section 132 is not retroactive and applies only to transactions commencing on or after January 12,1987.
As to the application of the prohibition, both formation and performance of contracts involving an unauthorized insurer or reinsurer are prohibited. Notwithstanding the fact that violation of section 2 of the 1982 Act was a criminal offense, such contracts have been found unenforceable, although some courts reached that conclusion in dicta (Phoenix Gen. Ins. Co. v Halvanon Ins. Co., [1988] 1 QB 216, 276 [dicta]; Bedford Ins. Co. v Institutio de Ressaguros do Brasil, [1984] 1 Lloyd’s Rep 210 [Parker, J.]; Re Cavalier Ins. Co., [1989] 2 Lloyd’s Rep 430, supra [Knox, J.] [refusal to permit liquidation claims on such policies]; Harbour Assur. Co. [U.K.] v Kansa Gen. Intl. Ins. Co., [1992] 1 Lloyd’s Rep 81).
A similar result was reached under the Insurance Companies Act of 1974, the prior version of the 1982 Act, in Stewart v Oriental Fire & Mar. Ins. Co. ([1984] 2 Lloyd’s Rep 109 [Leggatt, J.]), in a reinsurance situation with an “off-shore” consent procedure similar to that present here, with the prohibited performance by an unauthorized insurer consisting of issuance of the reinsurance policy, receipt of premiums, and payment of claims in the United Kingdom.
More directly on point is DR Ins. Co. v Seguros Am. Banamex ([1992] 1 Lloyd’s Rep 120 [Hamilton, A.J.]), which addressed this defendant’s claims under its Stetzel Thompson syndicate agreements against other members of the syndicates. The Deputy Judge found an illegality under the 1974, 1980 and 1982 Insurance Companies Acts, and found that the remedial statute was not retroactive.
The English courts have not adopted the type of saving analysis utilized on similar facts in Rosasco Creameries v Cohen (276 NY 274 [1937]). However, as noted at the outset of this branch of the discussion, the English regulation of insurers is part of a broad regulatory scheme.
Here, the reinsureds and Elkhorn, for reasons of their own, formed a New York policy to stand in the stead of the agreement based on the Lloyd’s placing slip. Both New York and English authorities hold that the actual policy controls the transaction and supplants the placing slip. In Sumitomo Mar. & Fire Ins. Co. v Cologne Reins. Co. (supra, affg 149 *215 AD2d 377 [1st Dept]), the reinsurance agreement was the dispositive factor in determining the rights of the parties, and reliance upon the equivalent of a placing slip as an "original contract” was rejected (see, 75 NY2d, at 302, 149 AD2d, at 377). English courts take the same view, holding that a placing slip cannot be used as aid to construction of the policy (Youell v Bland Welch & Co., [1990] 2 Lloyd’s Rep 431 [Phillips, J.], [1992] 2 Lloyd’s Rep 127 [Ct App]).
The proper context for consideration of the argument is that a reinsured seeks to enforce a New York policy. Should a New York policy be held void because the underlying agreement was reached through Lloyd’s or because the claims were, for a time, administered in London through a Lloyd’s broker? This question must be answered in the negative, for to find to the contrary would mean that sophisticated business entities may never substitute a proper contract for an improper one and that a malum prohibitum statute gives rise to a vested right to an unenforceable contract, defeating a subsequent cure.
This characterization is not hyperbole, for carrying forward a defect would, in the words of Judge Cardozo, mean that the foreign statute has created "an obligation, which * * * 'follows the person and may be enforced wherever the person may be found’ ” (Loucks v Standard Oil Co., 224 NY 99, 110 [1918], quoting Slater v Mexican Natl. R. R. Co., 194 US 120 [1904]; see also, Mertz v Mertz, 271 NY 466 [1936]). There is no language in the English decisions which suggests that the 1982 Act creates such a legal imperative, especially in light of the comment of the highest English court addressing the defense: "All that one can say in this regard is that any reputable reinsurers, solicitous of their good name, will no doubt hesitate long before relying on this defense.” (Phoenix Gen. Ins. Co. v Halvanon Ins. Co., supra, 1 QB, at 276.) Additionally, the Parliamentary determination that a court has the discretion to reject this defense in some cases confirms that the availability of this defense is not a matter supported by an inescapable public policy. Accordingly, this court does not find the English legislative policy is such that defendant has at hand a "foreign right” which must be enforced (Loucks v Standard Oil Co., supra, 224 NY, at 111).
There is no problem in applying New York law even if the insurance arrangement originated in London. In relation to Lloyd’s transactions, British courts seek to discern the "particular system of law * * * the parties * * * intended a contract to be interpreted * * * [as] the 'proper law’ of the contract” *216 (Amin Rasheed Shipping Corp. v Kuwait Ins. Co., [1984] 1 App Cas 50, 60, 65 [Diplock, L.J.]). In some instances, two systems of law are applied, as was done by the court in another reinsurance matter, Forsikringsaktieselskapet Vesta v Butcher ([1986] 2 All ER 488 [Hobhouse, J.], [1988] 1 Lloyd’s Rep 19 [Ct App], [1989] 1 Lloyd’s Rep 331 [House of Lords]). There, the reinsurance agreement apparently was a Lloyd’s policy issued in London, which was viewed as generally requiring interpretation under English standards; nonetheless, certain issues were governed by the law applicable to the underlying insurance policy, which was subject to the reinsurance. That court resolved the issue by applying what it called a "hybrid” approach. This court finds appropriate a different form of hybridization, one having a temporal division, with an earlier English placing slip agreement supplanted by a later New York policy.
Because of the probable rarity of the factors present here, the conclusion reached has little impact on the generally desirable goal of commercial certainty in the international reinsurance industry. Any commercial entity issuing an insurance policy within New York to New York reinsureds, factors which are present here, must surely consider the application of New York law, given New York’s strong and long-standing policy of enforcing just such insurance contracts (see, Insurance Law § 3103 [a]; Hopkins v Connecticut Gen. Life Ins. Co., 225 NY 76 [1918]; Bersani v General Acc. Fire & Life Assur. Corp., 36 NY2d 457 [1975]).
This court is satisfied that the particular policy in question is a New York policy, thus it is unnecessary to reach for further reasons to uphold its validity, such as possible waiver of the illegality (see, as to waiver, Sumitomo Mar. & Fire Ins. Co. v Cologne Reins. Co., supra, 75 NY2d, at 304). The court has considered several conflict of laws approaches (for an analysis of the various approaches, see, albeit directly posing a tort issue, Feldman v Acapulco Princess Hotel, 137 Misc 2d 878 [Sup Ct, NY County 1987, Glen, J.]). As noted above, defendant relies upon a vested rights theory and necessarily assumes that its rights vested in the London Lloyd’s market, which provides the lex loci contractus, such that its law governs the validity of the agreement because London was the "place of the making” and contract performance because London was the "place of performance.” The plaintiff has urged the court to apply an interest analysis or public policy approach.
*217 The court has adopted the approach that the law of the place of execution of the policy by the reinsurer governs (see, Government Empls. Ins. Co. v Sheerin, 65 AD2d 10 [2d Dept 1978]) when the tests for a New York policy are factually satisfied. There is no support in this State for judicial reformation of deliberately framed policy provisions upon the basis of conflict of law rules (see, American Home Assur. Co. v Employers Mut., 77 AD2d 421, affd 54 NY2d 874 [1981]).
Based upon the foregoing, the court finds that defendant, as Elkhorn’s successor, is liable under its policy. As was agreed on oral argument, the amounts involved in establishing a long account constitute an issue which may be referred to a Referee to examine (CPLR 4317 [b]). Accordingly, it is determined that the defendant’s liability under the policy is established and the affirmative defenses, including those which appear to have been abandoned, are stricken. The balance of the issues in relation to the maritime policy are referred to the Office of the Special Referee to hear and report, subject to a motion to confirm or disaffirm the Referee’s report.
In closing, the court notes that it is not entirely satisfied with the proof of foreign law submitted. Material in proper evidentiary form to establish Elkhorn’s lack of authorization is not presented (see, proper proof of authorization, People v British & Am. Cas. Co., 133 Misc 2d 352 [Sup Ct, NY County 1986]), nor does defendant explain why it is appropriate to consider the authorization of a syndicate member rather than the authorization of the syndicate.

Aviation Policies

Ideal was the reinsured on five aviation reinsurance policies, three of which are original reinsurance agreements and two of which are renewals. All five agreements had their origins in the Lloyd’s market as described above.
Several factors are notable. Here, unlike the marine policy which reinsured the entire risk, the Stetzel Thompson syndicate was not the only reinsurer but took only 5% to 20% of each risk. All of these arrangements were reduced to actual written reinsurance policies, with separate full policies issued on four transactions and one being reflected in an addendum to an existing policy because the syndicate was substituted for another reinsurer toward the end of the policy period. The policies reflect the name of the syndicate, not Elkhorn, and bear no Elkhorn signature.
*218 Plaintiff struggles mightily to cast Elkhorn as a fronter because of various placing slip notations. This effort fails because all of the actual policies name the reinsurance syndicate of which Elkhorn was a member, not Elkhorn, as the reinsurer. As explained above, once created, the policy or "wording” controls and the placing slip notations must be disregarded.
The court cautions that, even if it were to consider the placing slips, it would not be persuaded that Elkhorn was a fronter. There is no clear pattern of original advice to Elkhorn that Elkhorn was to be a fronter which, as noted above, was signaled by the name of Elkhorn appearing in the "retrocession of’ box on a bordereaux. Instead, there were some subsequent attempts by Stetzel Thompson to identify Elkhorn as a fronter, all of which were neither actually withdrawn nor constructively withdrawn because not incorporated in the "wording.”
In one instance, there was an actual amendment of a placing slip well after the original Stetzel Thompson stamp. All experts who addressed the frequency of such an amendment viewed the amendment as entirely unprecedented, which does not satisfy the burden of a proponent seeking to establish a binding obligation, which is a showing that it reflects custom and practice and is "notorious, certain and reasonable” (General Reins. Corp. v Forsakringsaktiebolaget Fennia Patria, [1983] 2 Lloyd’s Rep 287, citing Halsbury’s Laws of England, ¶ 45 [4th ed]). While there are recognized, well-known instances of permissible changeability in relation to a placing slip obligation, such as the practice of "signing down” to a lower percentage when the total percentage subscribed to by interested insurers exceeds 100% (see, General Acc. Fire & Life Assur. Corp. v Tanter [The "Zephyr”], [1984] 1 Lloyd’s Rep 58, mod [1985] 2 Lloyd’s Rep 529 [Ct App]), the particular instance present here does not meet the test of being an established market practice.
Nonetheless, the court is of the view that this argument has some good-faith basis, since the liquidator undoubtedly found references to fronting in reinsurance files. The word "fronting” has a second meaning in addition to being up front. The second connotation, described as an "in house” arrangement with an historical origin, was defined as an item of information conveyed to an entity requesting such information. It seems likely that such information was provided in this second sense, which underscores the need for a clear pattern of *219 confirmatory actions pointing to the single conclusion that the "up front” role was assumed by Elkhorn, a conclusion which lacks a factual basis in relation to these aviation policies.
Finally, the court notes that some of the policies state the reinsurers shall retrocede in relation to each other. No party explains the operation of this language nor its application to these facts. Plaintiff does not base its suit upon this provision, but only upon the contention that defendant must front the amounts due from the syndicate in which Elkhorn was a member. The court is not required to reach this unpleaded issue.
Based upon the foregoing, it is determined that Elkhorn’s successor is liable only as a member of the syndicate and bears responsibility only for 8.7% of the syndicate risk for 1979 arrangements and 5.6% of the same for any 1980 arrangements. At the concluding conference on these motions, defendant stated that if it were held liable for only its syndicate share, it would not raise the unauthorized insurance company issue and would concede liability on the dollar amount claimed without reference to a Special Referee to establish a long account.

The Long Account

On the New York marine policy, the liquidator presented exhibits documenting its claim for the period of January 1983 through February 1986. Given the court’s determination that this matter involves a New York policy, the Referee shall consider all claims arising under that policy, including such claims as may be asserted to the date of the hearing.
The examination of the claims will be of a limited nature. Article 6 of the policy specifically provides that settlements of loss shall be binding on Elkhorn and article 10 provides that the reinsurer will "follow the fortunes” of the reinsured. "Follow the fortunes” language typically imposes a form of condition precedent to the reinsurers’ payment. As recited in Insurance Co. v United States Fire Ins. Co. (67 Misc 2d 7, 10 [Sup Ct, NY County 1971], quoting the King’s Bench decision in Western Assur. Co. v Poole, [1903] 1 KB 376), provided the loss falls under the policy, prior to payment under such a clause: " 'The reinsurer * * * is entitled to require the reassured first to show that a loss of the kind reinsured has in fact happened; and, secondly, that the reassured has taken all proper and businesslike steps to have the amount of it fairly *220 and carefully ascertained. That is all. He must then pay’ ”. Under such a standard, for example, a reinsurer might not be required to pay punitive damages (see, American Ins. Co. v North Am. Co., 697 F2d 79, 81 [2d Cir 1982]). Follow the fortunes appears similar to a follow the settlements clause (see, Insurance Co. v Scor [U.K.] Reins. Co., [1985] 1 Lloyd’s Rep 312).
Additionally, the reinsurer has a special right of examination, for a limited time, if the reinsured is in liquidation (art 11). The court has been advised of no reason why defendant should not be allowed to exercise this right of examination here.
The Special Referee shall address all such questions raised by the parties and shall apply the principle that any ambiguities in contract language are to be resolved against the reinsurer (19 Couch, Insurance 2d § 80:49 [2d rev ed]). In the event of any discovery disputes in relation to establishment of the long account, the Special Referee is hereby also appointed Referee to supervise discovery and shall hear and determine discovery issues.
In reaching these conclusions, the court has reviewed the original slips, the cover notes sent to the reinsureds, the syndicate agreements, deposition testimony, affidavits from English insurance experts as to custom and usage in the London reinsurance market, and all other documentation submitted. The court has confirmed its understanding of Lloyd’s issues by reference to three papers authored by Stephen Lewis and Jan Woloniecki entitled The Terms of the Insurance/Reinsurance Contract, as to legal issues, and, as to the functioning of the Lloyd’s market, two further articles entitled The Role of the Broker and Lloyd’s: The Regulatory Structure (Lloyd’s, the ILU, and the London Insurance Market [P.L.I. 1990]). This court would project further refinement of the rules applicable to unauthorized insurers in Great Britain (see, Powell, 1992: Single European Market Implications for the Insurance Sector, 13 BC Intl & Comp L Rev 371 [1990]).
Given that the court has resolved the liability issues presented to it, the request for further discovery is denied. Such requests, which are of an exceedingly broad character, are now moot.
Accordingly, defendant’s motion for summary judgment is granted, with liability determined as conceded by defendant. Plaintiffs motion for summary judgment is denied as moot.